No. 24-5071

---

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

REPUBLICAN NATIONAL COMMITTEE, et al.,

*Plaintiffs-Appellants*,

v.

CARI-ANN BURGESS, in her official capacity as the Washoe County Registrar of Voters, et al.,

*Defendants-Appellees,*

VET VOICE FOUNDATION, et al.,

*Intervenor-Defendants–Appellees.*

---

On Appeal from the United States District Court
for the District of Nevada, Case No. 3:24-CV-00198
Hon. Miranda M. Du

---

## APPELLANTS' OPENING BRIEF

---

Jeffrey F. Barr
ASHCRAFT & BARR LLP
8275 South Eastern Ave., Ste. 200
Las Vegas, NV 89123
(702) 631-4755
barrj@ashcraftbarr.com

Sigal Chattah
CHATTAH LAW GROUP
5875 S. Rainbow Blvd #204
Las Vegas, NV 89118
(702) 360-6200
sigal@thegoodlawyerlv.com

Thomas R. McCarthy
Gilbert C. Dickey
Conor D. Woodfin
Thomas S. Vaseliou
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com

*Counsel for Plaintiffs-Appellants*
*(additional counsel listed in concluding signature blocks)*

## CORPORATE DISCLOSURE STATEMENT

The Republican National Committee, Nevada Republican Party, and Never Surrender, Inc. (formerly Donald J. Trump for President 2024, Inc.) are not subsidiaries or affiliates of any parent corporation or any publicly held corporation and no corporation owns 10% or more of their stock. No publicly owned corporation not a party to this case has a financial interest in the outcome of this case.

# TABLE OF CONTENTS

Corporate Disclosure Statement ...................................................................... ii

Table of Contents........................................................................................... iii

Table of Authorities ....................................................................................... v

Introduction ................................................................................................... 1

Jurisdictional Statement................................................................................. 3

Statement of the Issues Presented for Review ............................................. 4

Statutory Addendum....................................................................................... 4

Statement of the Case .................................................................................... 4

Standard of Review ...................................................................................... 10

Summary of the Argument ........................................................................... 11

Argument ..................................................................................................... 13

    I.   The Plaintiff organizations have direct organizational standing. ......... 13

        A.  The RNC and NVGOP pled plausible competitive and electoral injuries. ................................................................................................ 14

            1.  Being forced to participate in Nevada's "illegally structured competitive environment" is a concrete injury. ......................... 15

            2.  Plaintiffs plausibly alleged that permitting post-election receipt of mail ballots causes competitive and electoral injury to Republican candidates. ...............................................................20

            3.  Plaintiffs' injuries are redressable by an order enjoining Defendants from enforcing the post-election deadline. ...............................24

        B.  The Plaintiff organizations plausibly alleged harm to their preexisting core activities. ................................................................................. 27

            1.  Nevada's post-election ballot-receipt deadline impedes the Plaintiffs' activities to turn out Republican voters and elect Republican candidates. ..................................................................28

            2.  The Plaintiff organizations have plausibly alleged causation and redressability. ............................................................................... 36

            3.  The district court analyzed the wrong injuries. ......................... 38

    II.  Plaintiff organizations have associational standing. ........................... 40

    III. The district court improperly disputed Plaintiffs' factual claims. ....... 43

IV. In the alternative, the Court should remand with instructions to enter dismissal without prejudice ........................................................ 47

Conclusion ........................................................................................................ 48

Certificate of Compliance .............................................................................. 50

Certificate of Service ...................................................................................... 50

Certificate of Paper Copies ........................................................................... 50

Addendum of Statutory Provisions .............................................................. 1

# TABLE OF AUTHORITIES

## Cases

*Arakaki v. Lingle,*
  477 F.3d 1048 (9th Cir. 2007) ........................................................... 10

*Ariz. All. for Retired Ams. v. Mayes,*
  117 F.4th 1165 (9th Cir. 2024) .................................................... passim

*Arizona v. Yellen,*
  34 F.4th 841 (9th Cir. 2022) ............................................................. 10

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................... 23

*Becker v. FEC,*
  230 F.3d 381 (1st Cir. 2000) ............................................................. 36

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................... 23

*Bernhardt v. Cnty. of Los Angeles,*
  279 F.3d 862 (9th Cir. 2002) ............................................................. 38

*Bognet v. Degraffenreid,*
  141 S. Ct. 2508 (2021) ......................................................................... 6

*Bognet v. Sec'y Commonwealth of Pa.,*
  980 F.3d 336 (3d Cir. 2020) ................................................................. 6

*Bost v. Ill. State Bd. of Elections,*
  114 F.4th 634 (7th Cir. 2024) .............................................................. 6

*Bost v. Ill. State Bd. of Elections,*
  684 F. Supp. 3d 720 (N.D. Ill. July 26, 2023) .................................... 6

*Bush v. Gore,*
  531 U.S. 98 (2000) ............................................................................. 41

*Carney v. Adams,*
  592 U.S. 53 (2020) ............................................................................. 41

*Carson v. Simon,*
  978 F.3d 1051 (8th Cir. 2020) ................................................. 12, 40, 42

*Carter v. HealthPort Techs., LLC,*
  822 F.3d 47 (2d Cir. 2016) ................................................................. 45

*City of Oakland v. Hotels.com LP,*
  572 F.3d 958 (9th Cir. 2009) ............................................... 13, 46, 47

*Common Cause Ind. v. Lawson,*
  937 F.3d 944 (7th Cir. 2019) ................................................33, 34, 37

*Crawford v. Marion Cnty. Election Bd.,*
  472 F.3d 949 (7th Cir. 2007) ...........................................................37

*Democratic Cong. Campaign Comm. v. Kosinski,*
  614 F. Supp. 3d 20 (S.D.N.Y. 2022) ...............................................29

*Dep't of Commerce v. New York,*
  588 U.S. 752 (2019) .........................................................................26

*Desert Citizens Against Pollution v. Bisson,*
  231 F.3d 1172 (9th Cir. 2000) .........................................................43

*Donald J. Trump for President, Inc. v. Bullock,*
  491 F. Supp. 3d 814 (D. Mont. 2020).............................................19

*Donald J. Trump for President, Inc. v. Cegavske,*
  488 F. Supp. 3d 993 (D. Nev. 2020) ....................................6, 18, 38

*Donald J. Trump for President, Inc. v. Way,*
  2020 WL 6204477 (D.N.J. Oct. 22, 2020) .......................................7

*Drake v. Obama,*
  664 F.3d 774 (9th Cir. 2011) ...........................................................22

*Fair Elections Ohio v. Husted,*
  770 F.3d 456 (6th Cir. 2014) ...........................................................30

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024)....................................................................passim

*FEC v. Cruz,*
  596 U.S. 289 (2022) .................................................................12, 41

*Foster v. Love,*
  522 U.S. 67 (1997) ...........................................................................25

*Freeman v. Oakland Unified Sch. Dist.,*
  179 F.3d 846 (9th Cir. 1999) ...........................................................47

*Friends of the Earth v. Sanderson Farms, Inc.,*
  992 F.3d 939 (9th Cir. 2021) ...........................................................45

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
  528 U.S. 167 (2000) .........................................................................36

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982)....................................................................passim

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ................................................................ 40

*Idaho Conservation League v. Bonneville Power Admin.*,
    83 F.4th 1182 (9th Cir. 2023) ............................................... 41

*Jacobs v. Clark Cnty. Sch. Dist.*,
    526 F.3d 419 (9th Cir. 2008) ................................................ 14

*Kelly v. Fleetwood Enters.*,
    377 F.3d 1034 (9th Cir. 2004) .............................................. 47

*La Asociacion de Trabajadores de Lake Forest v. Lake Forest*,
    624 F.3d 1083 (9th Cir. 2010) .............................................. 34

*Leite v. Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014) .............................................. 45

*Leonard v. Clark*,
    12 F.3d 885 (9th Cir. 1993) .................................................. 11

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................... passim

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) .............................................. 39

*Mecinas v. Hobbs*,
    30 F.4th 890 (9th Cir. 2022) ........................................... passim

*Missouri ex rel. Koster v. Harris*,
    847 F.3d 646 (9th Cir. 2017) ................................... 13, 46, 47

*OCA-Greater Hous. v. Texas*,
    867 F.3d 604 (5th Cir. 2017) ........................................... 8, 32

*Owen v. Mulligan*,
    640 F.2d 1130 (9th Cir. 1981) .......................... 16, 17, 19, 24

*Planned Parenthood of Greater Wash. & N. Idaho v. HHS*,
    946 F.3d 1100 (9th Cir. 2020) ...................... 17, 20, 21, 25

*Preminger v. Peake*,
    552 F.3d 757 (9th Cir. 2008) ................................................ 14

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
    120 F.4th 390 (4th Cir. Oct. 29, 2024) ........................ 31, 32, 37

*Republican Nat'l Comm. v. Wetzel*,
    120 F.4th 200 (5th Cir. 2024) ...................................... passim

*Republican Nat'l Comm. v. Wetzel*,
   2024 WL 3559623 (S.D. Miss. July 28, 2024) ........................................ passim

*Roe v. Alabama ex rel. Evans*,
   43 F.3d 574 (11th Cir. 1995) ................................................................ 41

*Shays v. FEC*,
   414 F.3d 76 (D.C. Cir. 2005) ................................................................ passim

*Sierra Club v. EPA*,
   699 F.3d 530 (D.C. Cir. 2012) ............................................................. 41

*Splonskowski v. White*,
   714 F. Supp. 3d 1099 (D.N.D. 2024) .................................................. 7

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ............................................................................. 18

*Storer v. Brown*,
   415 U.S. 724 (1974) ............................................................................. 3

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ............................................................................. 35

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................................. 32

*Tex. Democratic Party v. Benkiser*,
   2006 WL 1851295 (W.D. Tex. July 6, 2006) ...................................... 22

*Tex. Democratic Party v. Benkiser*,
   459 F.3d 582 (5th Cir. 2006) ........................................... 15, 20, 22, 42

*Townley v. Miller*,
   722 F.3d 1128 (9th Cir. 2013) ...................................................... 25, 26

*Trump v. Wis. Elections Comm'n*,
   983 F.3d 919 (7th Cir. 2020) ............................................................. 40

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ................................................................. 13, 28, 30

*Vote.Org v. Callanen*,
   89 F.4th 459 (5th Cir. 2023) ......................................................... 8, 32

*Warth v. Seldin*,
   422 U.S. 490 (1975) ..................................................... 40, 43, 44, 46

*Wood v. Raffensperger*,
   981 F.3d 1307 (11th Cir. 2020) ......................................................... 41

## Statutes

2 U.S.C. §1 ............................................................................... 1, 3, 41

2 U.S.C. §7 ................................................................................... 1, 3

28 U.S.C. §1291 .............................................................................. 3

28 U.S.C. §1294 .............................................................................. 3

28 U.S.C. §1331 .............................................................................. 3

28 U.S.C. §1343 .............................................................................. 3

3 U.S.C. §1 ............................................................................... 1, 3, 41

Act of Feb. 2, 1872, ch. 11, §3, 17 Stat. 28 ............................... 4

Act of Jan. 23, 1845, ch. 1, 5 Stat. 721 ...................................... 4

Act of June 4, 1914, ch. 103, §1, 38 Stat. 384 ........................... 4

Nev. Rev. Stat. §293.269921 ............................................... passim

Nev. Rev. Stat. §293.269929 ..................................................... 29

Nev. Rev. Stat. §293.269931 ..................................................... 29

Nev. Rev. Stat. §293.317 (2019) ................................................. 5

## Other Authorities

Nat'l Conf. of State Legislatures, *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (June 12, 2024), perma.cc/X254-RTK2 ....... 6

*Overseas Absentee Voting: Hearing on S. 703 before the S. Comm. on Rules and Admin.*, 95th Cong. 33-34 (1977) .................................................................... 5

## Rules

Nev. Admin. Code §293.322 ...................................................... 29

Nev. Admin. Code §293.356 ...................................................... 29

## INTRODUCTION

Congress established a single "day for the election" of members of Congress and the appointment of presidential electors. 2 U.S.C. §§1, 7; 3 U.S.C. §1. Just last month, the Fifth Circuit held that "[t]ext, precedent, and historical practice confirm this 'day for the election' is the day by which ballots must be both *cast* by voters and *received* by state officials." *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200, 203-04 (5th Cir. 2024). But under Nevada law, elections do not end on election day. Instead, Nevada law permits receipt of mail ballots up to four business days *after* election day so long as those ballots are postmarked on or before election day. Nev. Rev. Stat. §293.269921(1). If the date of the postmark cannot be determined, Nevada still requires counting those ballots if received up to three days after election day. *Id.* §293.269921(2). But that practice of receiving ballots "after the federal election day" is "preempted by federal law." *RNC v. Wetzel*, 120 F.4th at 204.

In May 2024, the Republican National Committee (RNC), the Nevada Republican Party (NVGOP), Donald J. Trump For President 2024, Inc.,[1] and Nevada Republican voter Donald Szymanski filed this lawsuit challenging Nevada's post-election receipt deadline for mail ballots. Nevada's mail-ballot deadline concretely harms Plaintiffs in numerous ways. Post-election receipt of ballots increases and prolongs electoral competition for mail ballots between Plaintiffs and their political

---

[1] Donald J. Trump For President 2024, Inc. has changed its name to Never Surrender, Inc.

rivals past election day. It requires the Plaintiffs to run mail-ballot chase programs through election day, which diverts resources from their in-person turnout efforts, election-integrity programs, and post-election activities. And it injures Republican candidates, who are members of Plaintiffs' organizations, by creating an inaccurate vote tally due to the counting of invalid mail ballots received after election day. Each of these injuries is a concrete harm to the Plaintiffs, redressable by an order enjoining enforcement of Nevada's post-election receipt rules.

When a federal court in Mississippi addressed these same issues on summary judgment, it held that there was no material dispute of fact that Mississippi's post-election receipt of mail ballots injured the RNC, the Mississippi Republican Party, and the Libertarian Party. *See Republican Nat'l Comm. v. Wetzel*, __ F. Supp. 3d __, 2024 WL 3559623, at *2 (S.D. Miss. July 28, 2024), *rev'd on other grounds*, 120 F.4th 200. No party challenged that ruling on appeal, "presumably because this case fits comfortably within our precedents." *RNC v. Wetzel*, 120 F.4th at 205 n.3. After assuring itself of jurisdiction, the Fifth Circuit reversed on the merits, holding that Mississippi's law permitting post-election receipt of mail ballots "is preempted" by federal law. *Id.* at 215.

But the district court in this case concluded that the RNC and NVGOP failed even to *plead* an injury caused by a State's post-election receipt of ballots. ER-6. The district court ruled that Plaintiffs had not produced enough "evidence" at the pleading stage to prove their injuries. ER-11. And the district court stated that Plaintiffs' associational standing to represent the Republican candidates who are their members

did not even "warrant discussion." ER-17. While recognizing that Nevada's mail ballot deadline would cause Plaintiffs to make "additional expenditures" and likely require Plaintiffs to "devote more resources to poll watching and election-integrity trainings," the district court ruled that these injuries were not legally "cognizable." ER-11, 12. If upheld, the district court's ruling threatens to deprive political party organizations of every stripe—Republican, Democrat, and Libertarian alike—of standing to challenge election rules that directly affect the final vote tally. Article III does not bar the courthouse doors to America's political parties, who are essential to the very "fabric of government," *Storer v. Brown*, 415 U.S. 724, 736 (1974). This Court should reverse the district court's ruling and allow Plaintiffs' suit to proceed.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343, as Plaintiffs' suit presents a federal question concerning whether Nevada's mail-ballot deadline is legally valid under federal statutes, 2 U.S.C. §§1, 7; 3 U.S.C. §1, and the First and Fourteenth Amendments to the U.S. Constitution.

On July 17, 2024, the district court dismissed the case under Federal Rule of Civil Procedure 12(b)(1) for lack of standing. Plaintiffs filed a notice of appeal on August 16, 2024, which is timely under Fed. R. App. P. 3(a)(1), 4(a)(1), and 26(a)(1)(A)-(C). This Court thus has appellate jurisdiction under 28 U.S.C. §§1291, 1294(1).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1) Did the district court err in holding that Plaintiffs' complaint does not allege direct organizational standing to challenge Nevada's mail-ballot deadline?

2) Did the district court err in refusing to analyze Plaintiffs' associational standing to represent Republican candidates who are directly injured by an inaccurate vote tally?

3) Did the district court err in concluding that Plaintiffs must produce "evidence" of an injury at the pleading stage to demonstrate standing?

4) In the alternative, should this Court remand with instructions to enter dismissal without prejudice?

## STATUTORY ADDENDUM

The text of the pertinent constitutional and statutory provisions is reproduced in an accompanying addendum under Circuit Rule 28-2.7.

## STATEMENT OF THE CASE

Well over a century ago, Congress established a uniform day for congressional and presidential elections. In 1845, Congress mandated that in presidential election years "[t]he electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in the month of November." Act of Jan. 23, 1845, ch. 1, 5 Stat. 721. After the Civil War, Congress extended the rule to the House of Representatives, providing that "the Tuesday next after the first Monday in November, in every second year … is hereby fixed and established as the day for the election." Act of Feb. 2, 1872, ch. 11, §3, 17 Stat. 28. And soon after the Seventeenth

4

Amendment was ratified in the early twentieth century, Congress included Senators in the uniform election day. Act of June 4, 1914, ch. 103, §1, 38 Stat. 384. By necessity, elections throughout this period were conducted on a single day, and votes were cast and received in person.

Post-election receipt of absentee ballots is a relatively new phenomenon. In 1971, the Department of Defense surveyed state absentee-ballot deadlines. *Overseas Absentee Voting: Hearing on S. 703 before the S. Comm. on Rules and Admin.*, 95th Cong. 33-34 (1977) (Statement of John C. Broger, Deputy Coordinator of the Federal Voting Assistance Program, Department of Defense), perma.cc/P4PK-LTL2. At that time, 48 States plus Guam, Puerto Rico, the Virgin Islands, and Washington, D.C., counted ballots only if received by election day at the latest. *Id.* Only two States counted ballots received after election day: Nebraska accepted ballots one day after the election if "voted" on election day. *Id.* at 33. And Washington accepted ballots received up to fifteen days after the election if "voted" on election day. *Id.* at 34.

Until recently, Nevada—like most States—prohibited mail ballots from being counted if they were received after election day. Nevada law established that mail ballots received "after the polls are closed on the day of election are invalid." Nev. Rev. Stat. §293.317 (2019). Election day was the day that voters, candidates, campaigns, and election officials shifted their focus to in-person voting. Mail-ballot programs gave way to election-day turnout efforts as parties, candidates, and campaigns worked to get their voters to the polls.

Expanded mail-voting has changed those practices. Recently, some States began counting mail ballots that are received after election day. *See* Nat'l Conf. of State Legislatures, *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (June 12, 2024), perma.cc/X254-RTK2. Many of those States, including Nevada, adopted post-election deadlines only "for elections impacted by emergencies or disasters" in response to the COVID-19 pandemic. *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 996 (D. Nev. 2020). But in 2021, the Nevada Legislature codified post-election receipt of mail ballots for all elections regardless of emergency or disaster. *See* Act of June 2, 2021, A.B. No. 321, 2021 Nev. Laws Ch. 248, §56 (codified at Nev. Rev. Stat. §293.269921). Nevada law now permits mail ballots to be received up to four days after Election Day and allows mail ballots to be counted if "the date of the postmark cannot be determined" and the ballot is received by the third day following Election Day. Nev. Rev. Stat. §293.269921.

Some recent changes to ballot-receipt deadlines have been challenged in federal court. In Illinois, voters and political candidates challenged the State's receipt of ballots up to fourteen days after the election. *See Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720 (N.D. Ill. 2023). The district court dismissed the complaint on standing grounds, and the Seventh Circuit affirmed over a partial dissent by Judge Scudder. *See Bost v. Ill. State Bd. of Elections*, 114 F.4th 634, 644 (7th Cir. 2024). In Pennsylvania, the Third Circuit similarly ruled that a candidate did not have standing to challenge the State's three-day post-election receipt deadline. *See Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d

336, 347-52 (3d Cir. 2020). The Supreme Court granted certiorari and vacated the Third

Circuit's decision. *See Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). In New Jersey, the

RNC, New Jersey Republican State Committee, and 2020 Trump Campaign challenged

New Jersey's rule permitting receipt of ballots up to two days after election day even if

they lack a postmark. *See Donald J. Trump for President, Inc. v. Way*, 2020 WL 6204477, at

*4 (D.N.J. Oct. 22, 2020). The district court ruled that the plaintiffs did not have

standing based on their voter-education and poll-watching efforts. *See id.* at *10-11. The

plaintiffs did not appeal. Finally, in North Dakota, a county election auditor challenged

North Dakota's law requiring him to count ballots that are received after election day

but prior to the canvassing board's meeting, alleging a conflict of his duties that

subjected him to criminal prosecution. *Splonskowski v. White*, 714 F. Supp. 3d 1099, 1101

(D.N.D. 2024). The district court dismissed the complaint after finding that the plaintiff

was "not subject to criminal prosecution under any of the statutes mandating his duties

as a member of the canvassing board." *Id.* at 1104.

More recently, the RNC, the Mississippi Republican Party, and the Libertarian

Party of Mississippi challenged Mississippi's law requiring election officials to count

mail ballots received up to five business days after the election. *See RNC v. Wetzel*, 2024

WL 3559623, at *1. On summary judgment, the district court held that all three

organizations had standing because "the Mississippi statute will cause them to curtail

and divert resources away from specific activities and projects—registration of

Republican voters and efforts to increase in-person turnout—in order to perform more

extensive and expensive ballot-chasing and poll-watching efforts necessitated by the acceptance of absentee ballots received after election day." *Id.* at *4. Those injuries "are specific to each party," they "are fairly traceable to the Mississippi statute's five-day receipt requirement for absentee ballots," and they are redressable by "granting Plaintiffs' requests for declaratory and injunctive relief." *Id.* at *5. The court then ruled against the plaintiffs on the merits, holding that Mississippi's post-election day receipt of mail ballots did not conflict with the federal statutes establishing a uniform national election day. *See id.* at *11.

On appeal, no party disputed the district court's ruling that the Republican and Libertarian organizations had standing. As the Fifth Circuit observed, "[t]hat is presumably because this case fits comfortably within our precedents." *RNC v. Wetzel*, 120 F.4th at 205 n.3 (citing *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017); *Vote.Org v. Callanen*, 89 F.4th 459, 471 (5th Cir. 2023)). The Fifth Circuit then reversed the district court on the merits. Under federal law, "the election concludes when all ballots are received." *Id.* at 211. By permitting mail ballots to be received up to five business days after the election, Mississippi violated the federal statutes requiring States to abide by a uniform day for the election. *Id.* at 215.

About four months after the RNC filed the case in Mississippi, it filed this case in Nevada. Joined by the NVGOP, the 2024 Trump Campaign, and Mr. Szymanski, the RNC sued Nevada's Secretary of State and the relevant county election officials responsible for implementing Nevada's mail-ballot deadline. ER-24. The RNC is the

national arm of the Republican Party, organizing the nominating convention for the Republican presidential and vice-presidential candidates and representing over 30 million registered Republicans across America. ER-22. The NVGOP represents over 550,000 registered Republican voters in Nevada. ER-23. Donald J. Trump For President 2024, Inc. was the principal committee for President Donald J. Trump's 2024 reelection campaign. ER-23. Donald Szymanski is a registered Republican voter and a resident of Clark County, Nevada. ER-23.

Plaintiffs' complaint explains the numerous injuries they suffer as a result of Nevada's post-election receipt deadline. The Republican committees and the campaign suffer distinct competitive electoral harms from the mail-ballot deadline. Because "Democrats disproportionately vote[] by mail compared to Republicans," and because "[m]ail ballots from Democratic voters also tend to arrive late," Republican organizations and candidates suffer a distinct electoral injury from the post-election receipt deadline. ER-31. The RNC and NVGOP must also curb in-person turnout activities to run "mail-ballot-specific get-out-the-vote operations to encourage mail ballot voters to return their mail ballots through Election Day." ER-29. Allowing post-election receipt of mail ballots also requires the RNC and NVGOP to divert time and resources to post-election activities, such as observing "the handling and counting of mail ballots." ER-29. The Plaintiffs also alleged that Mr. Szymanski, as a registered Republican voter, suffers an injury when ballots that violate federal law are included in the final tally, diluting his own vote. ER-29, 32. Plaintiffs seek a declaratory judgment

that Nevada's revised mail ballot deadline violates federal law, and a permanent injunction prohibiting the state and county Defendants from enforcing the revised deadline.

Several organizations, including the Democratic National Committee, Vet Voice Foundation, and the Nevada Alliance for Retired Americans, moved to intervene as Defendants in support of Nevada's post-election deadline. The court granted all intervention motions. The Secretary of State, the DNC, and Vet Voice each moved to dismiss the Plaintiffs' complaint under Rules 12(b)(1) and 12(b)(6). The district court granted the Defendants' motions, concluding that Plaintiffs "do not have standing" to challenge Nevada's post-election receipt of ballots "merely because it might create more work for them" or result in "additional expenditures." ER-12, 13. The court deemed the organization's electoral injuries speculative because the court was "entirely uncertain" how the post-election receipt of ballots "would play out for Republican candidates in Nevada this November." ER-8. And the court concluded that Plaintiffs' associational standing on behalf of Republican candidates did "not warrant discussion." ER-11, 17. Plaintiffs timely appealed the district court's dismissal. ER-37.

## STANDARD OF REVIEW

"Standing is a legal issue subject to *de novo* review." *Arakaki v. Lingle*, 477 F.3d 1048, 1056 (9th Cir. 2007). When standing is challenged at the pleading stage, "general factual allegations of injury" may "suffice," because courts must "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*

*v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up). Indeed, in analyzing standing, this Court must view the merits of Plaintiffs' claims "through [Plaintiffs'] eyes." *Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022). And in a suit such as this one with multiple plaintiffs, only "one of the plaintiffs" need demonstrate standing for the suit to proceed. *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993).

## SUMMARY OF THE ARGUMENT

The district court erred in dismissing Plaintiffs' complaint for lack of standing. Plaintiffs plausibly pled that Nevada's revised mail-ballot deadline causes them and their members at least three injuries, each of which are sufficient for standing.

*First*, Nevada's law increases and prolongs the competition for mail ballots between Plaintiffs and their political rivals past Election Day. ER-21-23, 29-31. It forces Plaintiffs to compete for mail ballots in an "illegally structured competitive environment" that disproportionately disadvantages Republican candidates. *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) (cleaned up). Nevada's multi-day election "makes the competitive landscape worse" for Plaintiffs, *id.*, by extending the competition for mail ballots for four days past Election Day, ER-30-32. Further, Nevada's extended deadline for mail ballots disproportionately benefits Democrats, whose voters overwhelmingly tend to vote by mail and return those ballots later than Republicans. ER-30-32.

*Second*, Nevada's post-election deadline for mail ballots harms the RNC and NVGOP's core activities. Because the later deadline effectively extends the competition

for mail ballots, Plaintiffs must divert resources from other in-person turnout efforts to run mail-ballot chase programs through election day. ER-22-23, 28-29. Replacing an election-day deadline with a postmark rule also means that Plaintiffs must divert additional resources to poll-watching efforts and post-election observation. ER-22-23, 28-29. Each of these injuries impedes the RNC and NVGOP's efforts to turn out Republican voters and elect Republican candidates, and they've had to divert resources from other core activities to counteract those injuries. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-80 (1982).

*Third*, the RNC and NVGOP have associational standing to represent their candidate members who are injured by counting ballots that are invalid under federal law. As Republican organizations, Plaintiffs represent "Republican candidates" in Nevada elections and other States "for election to the Presidency, U.S. Senate, and U.S. House of Representatives." ER-22. Those candidates "have a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast." *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020). For standing purposes, this Court must "accept as valid the merits of [the plaintiffs'] legal claims" that votes received after election day violate federal law. *FEC v. Cruz*, 596 U.S. 289, 298 (2022). And by counting those invalid ballots, Defendants directly injure Plaintiffs' candidate members. The district court didn't even address this basis for Plaintiffs' standing.

The district court also erred by requiring Plaintiffs to prove their standing with "evidence" at the pleading stage. ER-11. The court disputed Plaintiffs' factual

allegations, disagreed with Plaintiffs' sources, demanded "more specific information," and speculated how Plaintiffs' factual allegations might be wrong. ER-7, 11. Each of these errors improperly raises the bar to plead a plausible claim. *Lujan*, 504 U.S. at 561.

Finally, even if this Court affirms the district court's dismissal of the complaint, it should remand with instructions to enter that dismissal without prejudice. "In general, dismissal for lack of subject matter jurisdiction is without prejudice." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017). But the district court immediately closed the case after dismissing Plaintiffs' complaint. In this circumstance, when this Court agrees that dismissal was appropriate, it will "affirm the dismissal for lack of subject matter jurisdiction but remand so that the dismissal is without prejudice." *City of Oakland v. Hotels.com LP*, 572 F.3d 958, 962 (9th Cir. 2009).

## ARGUMENT

### I. The Plaintiff organizations have direct organizational standing.

The "essence" of constitutional standing is "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 260-61 (1977) (cleaned up). Political parties and campaigns have a "personal stake" in the rules that govern the elections in which they participate. *Id.* And they are organizations, which "have standing 'to sue on their own behalf for injuries they have sustained.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024) (citation omitted).

For direct organizational standing, Plaintiffs must have "been injured or will imminently be injured," the "defendant's conduct" must have caused the injury, and the injury must be redressable. *Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1172 (9th Cir. 2024). The alleged injury "may be minimal," amounting to nothing more than "an identifiable trifle." *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008) (citation omitted). The RNC and NVGOP comfortably clear this bar by alleging plausible competitive and electoral injuries, as well as injuries to their preexisting organizational activities.[2] Each is sufficient to confer standing.

### A.    The RNC and NVGOP pled plausible competitive and electoral injuries.

"Competitive standing recognizes the injury that results from being forced to participate in an illegally structured competitive environment." *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) (cleaned up). It is "neither novel nor unique to the realm of the electoral." *Id.* "[A] candidate and a candidate's political party can assert standing based on their shared interest in 'fair competition….'" *Id.* at 898 n.3.

The RNC and NVGOP suffer two forms of competitive injury. First, Nevada's post-election receipt deadline unlawfully lengthens the competition for mail ballots,

---

[2] The 2024 Trump Campaign had similar interests and injuries in this case as the RNC and NVGOP with respect to the reelection of President Trump in the November 2024 election. Even though President Trump has now won that election, the Ninth Circuit examines each claim "to determine whether at least one plaintiff … retains a live claim." *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 425-26 (9th Cir. 2008). For the reasons explained in this brief, the RNC and NVGOP retain live claims.

which requires the RNC and NVGOP to work to prevent their opponents from gaining an unfair advantage. Second, Nevada's post-election receipt deadline disproportionately harms Republican candidates' electoral chances. Each is a valid competitive harm.

### 1.    Being forced to participate in Nevada's "illegally structured competitive environment" is a concrete injury.

When election rules "illegally structure a competitive environment … parties defending concrete interests (e.g., retention of elected office) in that environment suffer legal harm under Article III." *Shays v. FEC*, 414 F.3d 76, 82, 87 (D.C. Cir. 2005) (upholding standing of congressional candidates "waging reelection contests governed by" the challenged law). "Voluminous" authority shows that candidates and parties suffer injury when their "chances of victory would be reduced." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 & n.4 (5th Cir. 2006) (collecting cases). Just two years ago, this Court reaffirmed its "long-held position that the 'potential loss of an election' may give rise to standing." *Mecinas*, 30 F.4th at 899 (quoting *Townley v. Miller*, 722 F.3d 1128, 1135-36 (9th Cir. 2013)).

As the D.C. Circuit has explained, the "illegal structuring of a competitive environment" directly harms political candidates. *Shays*, 414 F.3d at 85; *see also Mecinas*, 30 F.4th at 899. In *Shays*, two members of Congress had standing "as candidates waging reelection contests" to challenge several rules promulgated by the Federal Election Commission. 414 F.3d at 82. The plaintiffs alleged that the "FEC implementing regulations are too lax," which meant their "opponents may undertake any conduct

permitted by the challenged regulations without fear of penalty." *Id.* at 82, 84. This "*intensified* competition" injured the candidates. *Id.* at 86. They had to "anticipate and respond to a broader range of competitive tactics than federal law would otherwise allow." *Id.* at 86. And the "need to account for additional practices" in strategy and "additional campaign activity" supported "Article III standing." *Id.*

This Court agreed in *Owen v. Mulligan*, holding that Republican candidates and committee leaders had standing to challenge postal-service practices that gave preferential mailing rates to Democrats. 640 F.2d 1130, 1131-33 (9th Cir. 1981). Even though the practice didn't directly harm the Republican plaintiffs, it was enough that the practice required them to work "to prevent their opponent from gaining an unfair advantage in the election process." *Id.* at 1133.

This Court recently reaffirmed that increased competition caused by an unlawful competitive environment is a cognizable injury. In *Mecinas v. Hobbs*, the DNC challenged Arizona's law requiring that counties list first on the general election ballot the candidate affiliated with the political party of the person who received the most votes in that county in the last gubernatorial race. 30 F.4th at 898. To show injury, the DNC relied on expert testimony of a "psychological phenomenon known as 'position bias' or the 'primacy effect'" that results in the first-listed candidate receiving slightly more votes simply for being listed first. *Id.* at 895. This Court found that the DNC had standing, explaining that a party or candidate has concrete harm when an "unlawful election regulations" makes "the competitive landscape worse." *Id.* at 898.

The Republican organizations have competitive standing regardless of whether the post-election deadline actually favors one party over another. That's because Republican committees and candidates "'are at the very least harmed by having to anticipate other actors taking advantage of the regulations to engage in activities that otherwise would be barred.'" *Shays*, 414 F.3d at 87 (citation omitted). As this Court has explained outside the electoral context, competitive standing merely requires the plaintiff to show that the challenged rule "increases competition." *Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100, 1108 (9th Cir. 2020). "[T]he injury is the increase in competition." *Id.*

Plaintiffs alleged an increase in competition caused by extending the time to mail absentee ballots. ER-21, 30-32. Plaintiffs must conduct "additional campaign activity," *Shays*, 414 F.3d at 86, to compete against rival candidates for mail ballots through election day, which "makes the competitive landscape worse" for Plaintiffs, *Mecinas*, 30 F.4th at 898. Ballot-receipt deadlines that affect the final vote tally, no less than campaign-finance rules, "necessarily affect the way these politicians will run their campaigns." *Shays*, 414 F.3d at 87 (cleaned up). Due to Nevada's extended deadlines, Plaintiffs face "intensified competition," *id.*, which is enough to give Plaintiffs "a personal stake" sufficient for standing, *Owen*, 640 F.2d at 1133. It is therefore sufficient that the post-election deadline forces both parties to work "to prevent their opponent from gaining an unfair advantage in the election process." *Id.* at 1133.

Even though this Court has held that an "illegally structured competitive environment" is a concrete injury, *Mecinas*, 30 F.4th at 898, the district court "disagree[d]" that "being forced to participate in an 'illegally structured competitive environment'" is "sufficient to confer competitive standing," ER-9 (cleaned up). In place of this Court's holding, the district court substituted a novel requirement that the "Republican candidates" must show some "unique" harm presented by the challenged law that unfairly burdens "Republican candidates" but not "their electoral opponents." ER-10 (quoting *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1003 (D. Nev. 2020)). But there's no "uniqueness" requirement for Article III standing. "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 n.7 (2016).

But even if "more" were required for competitive standing, ER-9, the Plaintiffs allege partisan unfairness, too. Nevada extended the deadline for the type of voting that Democrats are more likely to engage in: mail voting. ER-30-31. Because "voting by mail is starkly polarized by party" both nationally and in Nevada, extending the deadline to mail ballots "specifically harms" the Republican Plaintiffs. ER-30-31. "Mail ballots from Democratic voters also tend to arrive late, in part because 'Democratic get-out-the-vote drives—which habitually occur shortly before election day——may delay maximum Democratic voting across-the-board, and produce a 'blue shift' in late mail ballots.'" ER-31 (citation omitted). So "'even if Republicans and Democrats voted in person and

by mail at identical levels, Democrats tend to vote later, which in turn (particularly in elections with heavy voting by mail) means early Republican leads in close races could be fragile.'" ER-31 (citation omitted). Thus, extended mail deadlines produce a "resultant unfair disadvantage from that illegality which constitute[s] an injury in fact." ER-9. That the extended deadline at least "arguably promote[s] [their opponent's] electoral prospects" is an injury in fact. *Owen*, 640 F.2d at 1133; *see also Donald J. Trump for President, Inc. v. Bullock*, 491 F. Supp. 3d 814, 829 (D. Mont. 2020) (holding that the 2020 Trump campaign had standing to challenge directive that reduces "in-person voting opportunities").

The district court also created a new "equal availability" exception to competitive injury. The court reasoned that "[a]ny 'advantage' that Democrats may gain from the four-day grace period is one that appears to be equally available to, but simply less often employed by, Republicans." ER-10. But this Court has never applied an "equal availability" exception to competitive standing. Rather, pleading the existence of "an allegedly unlawful election regulation" that "*makes the competitive landscape worse* for a candidate or that candidate's party than it would otherwise be" is enough. 30 F.4th at 898 (emphasis added). And the D.C. Circuit has explicitly rejected the "equal availability" theory. In *Shays*, the political candidates had standing even though their rivals did not "enjoy 'special benefits' unavailable to the two Congressmen." 414 F.3d at 86. What mattered was that the new campaign finance rules opened opportunities for "rival state parties," not that the rules opened the same opportunities for the

plaintiff candidates. *Id.* The rules meant that the plaintiff candidates had to account for "additional tactics" that "fundamentally alter the environment in which rival parties defend their concrete interests (e.g., their interest in persuading regulators, retaining customers, or winning reelection)." *Id.*

Whether based on an illegally structured competitive environment or a real partisan disadvantage, the Plaintiffs' complaint alleges a competitive injury. Indeed, "it would be odd" if Plaintiffs "couldn't challenge more elementary distortions that alter the competitive environment's overall rules." *Id.* Because Plaintiffs pled that Nevada's mail ballot deadline harms their electoral chances and requires them to compete in an illegally structured environment, they have pled an injury in fact.

### 2. Plaintiffs plausibly alleged that permitting post-election receipt of mail ballots causes competitive and electoral injury to Republican candidates.

"Causation and redressability are generally implicit in injury-in-fact under the competitor standing doctrine." *Planned Parenthood*, 946 F.3d at 1108. The injury is the resultant "increase in competition" rather than the direct regulation of the plaintiff. *Id.* While the "court does not have the power to decide the winner of" the competition, it "does have the power to decide that particular criteria are impermissible." *Id.* at 1109. In the election context, courts frequently hold that parties and candidates have standing to challenge rules that result in increased competition. *See, e.g.*, *Tex. Democratic Party*, 459 F.3d at 587 & n.4 (collecting cases) (holding that the Texas Democratic Party had standing to challenge the replacement of the Republican candidate on the ballot).

Causation requires a "connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. Nevada's post-election mail-ballot deadline inarguably causes the competition between political parties for mail ballots to go on longer than it would under the federal election-day deadline. *See* Nev. Rev. Stat. §293.269921(1)-(2). The district court even acknowledged that the extended deadline causes "more work" for Plaintiffs. ER-13. Because Nevada permits mail-ballot receipt up to four days after election day, political parties, candidates, and campaigns must chase ballots through election day, as well as monitor the mail system for several additional days for any issues that could delay receipt of those ballots. That additional competitive work to chase ballots through election day is a natural result of extending the time for voters to return their ballots. *See Shays*, 414 F.3d at 86 (The "need to account for additional *practices*" and "additional campaign activity ... supports Article III standing.").

That competitive work is shouldered by the Plaintiff organizations—not voters. The district court reasoned that Plaintiffs' injury "arises from the government's allegedly unlawful regulation of a third party: Nevada voters." ER-6 (cleaned up). It concluded that "[c]ausation and redressability therefore hinge on the response" of third parties—"voters"—and "[t]he causal link between counting mail ballots received after Election Day in Nevada" and "Plaintiffs' alleged electoral injuries is too speculative to support standing." ER-6-7. But by focusing on "the response" of "voters," ER-7, the district court missed the "key" to Plaintiffs' injury, *Planned Parenthood*, 946 F.3d at 1108. "The

key is that the injury is the increase in competition." *Id.* Regardless of the voters' behavior—or even their competitors' behavior—Plaintiffs "are at the very least harmed by having to anticipate other actors taking advantage of the regulations to engage in activities that otherwise would be barred." *Shays*, 414 F.3d at 87 (citation omitted).

Even if those competitive harms were insufficient, Plaintiffs allege that Nevada's post-election deadline "hurts the candidate's or party's own chances of prevailing in the election." *Drake v. Obama*, 664 F.3d 774, 782 (9th Cir. 2011). That injury "has been recognized by several circuits." *Id.* at 783 (collecting cases). Just as the DNC was injured by voter behavior that was downstream from the ballot-order statute, *Mecinas*, 30 F.4th at 899-900, the RNC is injured by voter behavior that is downstream from the mail-deadline statute, ER-30-31. Again, the district court ruled that the causal link was broken by the intervening "response of those voters." ER-7. But that reasoning is irreconcilable with "this Court's long-held position that the 'potential loss of an election' may give rise to standing" to challenge election rules that are upstream of the voters' predictable behavior. *Mecinas*, 30 F.4th at 899. Rules that affect the final vote tally *always* involve the actions of voters. But a political party has standing to avoid "harm to its election prospects," and all that is required is that the party's "chances of victory" are "reduced" by the law it challenges. *Tex. Democratic Party*, 459 F.3d at 586. Hence, "[p]olitical parties have often been determined to have standing to challenge the constitutionality of federal or state election laws." *Tex. Democratic Party v. Benkiser*, 2006 WL 1851295, at *3 (W.D. Tex. July 6, 2006) (collecting cases), *aff'd*, 459 F.3d 582.

At this stage, the district court was required to accept as true the Plaintiffs' allegations that the ballot-deadline harms Republicans' electoral chances. Instead, the court disputed those factual claims. *See* ER-7 n.4. The Plaintiffs alleged that Nevada's post-election receipt deadline "specifically and disproportionately harms Republican candidates and voters." ER-32. "At the pleading stage," those "general factual allegations of injury resulting from the defendant's conduct" should have "suffice[d]." *Lujan*, 504 U.S. at 561.

But the complaint includes more. The complaint details how Democrats overwhelmingly vote by mail compared to Republicans both nationally and in Nevada. *See* ER-30-31. And it explains that "[m]ail ballots from Democratic voters also tend to arrive late" compared to mail ballots from Republican voters. ER-31. These facts result in the familiar "blue shift" in election results after late-arriving mail ballots are counted. ER-31. Plaintiffs provided specific data and sources to support these factual claims, even though "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The district court nevertheless demanded yet "*more* specific information about the timing of mail voting in Nevada." ER-7 n.4 (emphasis added). But the court was required to "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (cleaned up). Taking Plaintiffs' allegations as true, the complaint provides sufficient "factual content" for "the court to draw the

reasonable inference" that the later ballot-receipt deadlines harm Republican candidates' electoral chances. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The district court also misapplied precedent to support its causation analysis. The district court cited the holding in *Alliance for Hippocratic Medicine* that Plaintiffs "cannot rely on speculation about the unfettered choices made by independent actors" to establish standing. ER-7 (quoting *All. for Hippocratic Med.*, 602 U.S. at 383). But that case does not discuss the competitive-standing doctrine. Rather, the plaintiffs in that case relied on a "doctor standing" theory, alleging injury due to a government regulation that might cause "more individuals" to "show up at emergency rooms or in doctors' offices with follow-on injuries." *All. for Hippocratic Med.*, 602 U.S. at 391. When this Court has applied *competitive* standing, the behavior of voters does not break the causal chain. *See Mecinas*, 30 F.4th at 898. That's because the injury "is the potential loss of an election," not the potential loss of an individual vote. *Owen*, 640 F.2d at 1132. The district court's reliance on *Alliance for Hippocratic Medicine* for competitive standing demonstrates that the court fundamentally misdiagnosed Plaintiffs' competitive injury.

### 3. Plaintiffs' injuries are redressable by an order enjoining Defendants from enforcing the post-election deadline.

"Plaintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable decision." *Mecinas*, 30 F.4th at 900 (citation omitted). Rather, "[r]edressability is satisfied so long as the requested remedy 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly

redresses the injury suffered.'" *Id.* (citation omitted). The focus of redressability is "the connection between the alleged injury and requested relief." *Id.* at 899 (citation omitted). So long as the requested relief would "likely" mitigate the Plaintiffs' injury, *id.* at 896, redressability is satisfied.

Plaintiffs' requested declaratory and injunctive relief would remedy their competitive and electoral injuries. Plaintiffs request a declaratory judgment that Nevada's post-election deadline violates federal law. *See* ER-35. And they request an injunction against the Defendants from enforcing Nevada's post-election deadline. *See* ER-35. The district court did not address whether these remedies against the Defendants would "increase in the likelihood" that Plaintiffs' injuries would be redressed. *Mecinas*, 30 F.4th at 900 (citation omitted). But it's well established that violations of the federal election-day statutes can be remedied through prospective injunctive relief. *See, e.g., Foster v. Love*, 522 U.S. 67, 72 (1997) (upholding prospective injunctive relief barring enforcement of an election system where "a contested selection of candidates for a congressional office … is concluded as a matter of law before the federal election day"). And because the Plaintiffs have shown injury and causation, *see supra* Sections I.A.1 & I.A.2, redressability is "generally implicit" where the Plaintiffs sued the state officials responsible for enforcing the rule that they challenge, *Planned Parenthood*, 946 F.3d at 1108.

The district court instead relied on *Townley v. Miller*, ER-6-7, in which this Court held that the Nevada Republican Party failed to show traceability and redressability for

its challenge to a statute mandating the appearance of a 'none of these candidates' option on the ballot. 722 F.3d 1128, 1131, 1135 (9th Cir. 2013). But the reason the party's electoral injuries in *Townley* weren't redressable was that the party "did not challenge the inclusion" of 'none of these candidates' "as a voting option on the ballot." *Id.* at 1136. Instead, it challenged "only the subsection" of the law that prohibited ballots cast for 'none of these candidates' "from being given legal effect." *Id.* The party's "alleged *competitive* injury" (siphoning of votes to 'none of these candidates') would thus not have been redressed by an order requiring the State to "give legal effect to the ballots" cast for 'none of these candidates.' *Id.* As this Court recently clarified, it is "error" for a district court to construe *Townley* as "narrowing the scope of competitive standing." *Mecinas*, 30 F.4th at 899 (cleaned up). "Rather than narrowing competitive standing as a basis for injury in fact, *Townley* reasserted this Court's long-held position that 'the potential loss of an election' may give rise to standing." *Id.*

To be sure, whether relief against the Defendants will change the outcome of an election is uncertain. But this Court has rejected the notion that Plaintiffs must allege that the rule they challenge "has changed (or will imminently change) the actual outcome of a partisan election." *Id.* at 899 (citation omitted). Plaintiffs' injuries thus do not rest on speculation about what "[s]ome affected voters might choose" to do. ER-8. At most, Plaintiffs' partisan electoral injuries depend on "the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019). A predictable effect of Nevada's extended mail-ballot deadline

26

is that at least some mail ballots containing votes for candidates opposing Plaintiffs' candidates will be received and counted after Election Day. And because of the partisan tendencies of mail voting, those ballots *as a whole* harm Republican candidates' electoral prospects. ER-30-31. Plaintiffs need not prove that an outcome-determinative number of votes will be received after Election Day to have standing. *Mecinas*, 30 F.4th at 899.

### B. The Plaintiff organizations plausibly alleged harm to their preexisting core activities.

In addition to their competitive and electoral injuries, the Plaintiff organizations pled injury to their preexisting core activities to turn out Republican voters and elect Republican candidates. ER-22-23, 30-32. Plaintiffs allege that Nevada's post-election deadline makes their ballot-chase programs and poll-watching activities more difficult and less effective, which necessarily harms their ability to turn out Republican voters and elect Republican candidates. ER-22-23. Those are not "abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). They are concrete, preexisting activities that are essential to the Plaintiff organizations. *See id.*

The district court recognized that Nevada's revised mail-ballot deadline "might," "could," and "may" cause all these injuries. ER-12. But the court still ruled that Plaintiffs' alleged injuries were not legally "cognizable." ER-11. That ruling conflicts with recent organizational standing precedent. *See All. for Hippocratic Med.*, 602 U.S. at 393-96; *Ariz. All. for Retired Ams.*, 117 F.4th at 1173-79. Further, to reach its decision, the district court analyzed the wrong injury, coming up with separate theories of

standing that Plaintiffs did not present, attributing those theories to Plaintiffs, and then dismissing Plaintiffs' entire case based on those irrelevant standing theories. ER-13. Each of these errors warrants reversal.

> **1.** **Nevada's post-election ballot-receipt deadline impedes the Plaintiffs' activities to turn out Republican voters and elect Republican candidates.**

Organizations—no less than individuals—have standing if they allege a "personal stake in the outcome of the controversy." *Arlington Heights*, 429 U.S. at 261 (citation omitted). One way an organization can plead an "injury in fact" is by alleging a "concrete and demonstrable injury to the organization's activities" accompanied by a "consequent drain on the organization's resources." *Havens Realty*, 455 U.S. at 379. The "injury to the organization's activities" is a necessary ingredient. *Id.* "Organizations can no longer spend their way to standing based on vague claims that a policy hampers their mission." *Ariz. All. for Retired Ams.*, 117 F.4th at 1170. Thus, an organization suffers an injury when "a challenged governmental action directly injures the organization's pre-existing core activities and does so *apart* from the plaintiffs' response to that governmental action." *Id.*

The Plaintiff organizations engage in regular activities that are injured by the post-election deadline. "The RNC works to elect Republican candidates to state and federal office." ER-22. To achieve those goals, the RNC engages "in-person voting activities and election-integrity measures," as well as "mail ballot chase programs and post-election activities" such as ballot observation. ER-22-23, 29. As a Mississippi

district court recently explained, post-election receipt of mail ballots requires the RNC "to perform more extensive and expensive ballot-chasing and poll-watching efforts necessitated by the acceptance of absentee ballots received after election day." *RNC v. Wetzel*, 2024 WL 3559623, at \*4. Extending the deadline for mail-ballot receipt necessarily extends the *competition* for mail ballots. And to "elect Republican candidates" and turn out Republican voters, the RNC must participate in that extended competition. ER-22.

The RNC is thus put in a Catch-22: forego the extended competition for mail ballots, or "divert resources from in-person voting activities and election-integrity measures, and instead spend money on mail ballot chase programs." ER-22-23. Either decision "frustrates and impedes the Republican Party's mission of 'represent[ing] the interests of the Republican Party and secur[ing] the election of Republican candidates for state and federal office.'" *RNC v. Wetzel*, 2024 WL 3559623, at \*4 (quoting *Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 45 (S.D.N.Y. 2022) (collecting cases)). The NVGOP engages in similar activities to advance similar interests. *See* ER-23.

Nevada law also gives the Plaintiff organizations a statutory right to observe ballot counting. State law guarantees different political parties the right to be represented on county mail-ballot central counting boards. *See* Nev. Rev. Stat. §293.269929(2) ("The voters appointed as election board officers for the mail ballot central counting board must not all be of the same political party."). State law also

29

guarantees Plaintiffs the right to observe the handling and counting of mail ballots. *See id.* §293.269931(1); Nev. Admin. Code §§293.322(3)-(4), .356(1). Because counting may continue up to "the seventh day following an election," Nev. Rev. Stat. §293.269931(1), "[c]ounting ballots received after Election Day thus requires Plaintiffs and their members to divert more time and money to post-election mail ballot activities," ER-29. Those activities include, for example, "training of poll watchers, 'preparation of relevant materials, payment to attorneys for review, and securing additional volunteer time.'" *RNC v. Wetzel*, 2024 WL 3559623, at *4.

Each of these injuries "is not mere abstract concern about a problem of general interest." *Arlington Heights*, 429 U.S. at 263. They are concrete injuries to each organization's core activities that "the general population will not experience." *RNC v. Wetzel*, 2024 WL 3559623, at *5. Even each organizations' concrete goals are not identical. The RNC is focused on electing Republicans nationwide. ER-22. The NVGOP is focused on electing Republicans in Nevada. ER-23. And the 2024 Trump Campaign was focused on reelecting Donald Trump. ER-23. These are not the sort of "abstract organizational mission[s]" like "ensuring equal protection or safeguarding property rights" of which federal courts are skeptical. *Ariz. All. for Retired Ams.*, 117 F.4th at 1175. They are concrete objectives with tangible outcomes. And the Plaintiffs' core activities affected by late ballots—voter-turnout efforts, ballot chasing, and poll-watching—directly further those concrete goals. Put simply, if "a political party can

30

marshal its forces more effectively by winning its lawsuit, that ought to be enough for Article III." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014).

*Alliance for Hippocratic Medicine* confirms these principles. In that case, the Supreme Court held that medical associations did not have standing to challenge an FDA regulation simply because of "incurring costs to oppose FDA's actions." *All. for Hippocratic Med.*, 602 U.S. at 394. But the Plaintiffs here don't rely on costs taken "to oppose" Nevada's post-election deadline. *Id.* Rather, they rely on injury to their "core business activities" to turn out and elect Republicans. *Id.* at 395. This would be a different case if the RNC relied on money spent to oppose Nevada's post-election deadline because it harmed Republican values or conflicted with the RNC's ideals. Those are the sort of "abstract social interests" that the Supreme Court warned against. *Havens Realty*, 455 U.S. at 379. But the Plaintiff organizations rely on injury to their core activities that occurs *regardless* of whether they act "to oppose" Nevada's post-election deadline. *All. for Hippocratic Med.*, 602 U.S. at 394.

Indeed, following *Alliance for Hippocratic Medicine*, both the Fourth and Fifth Circuits have upheld the RNC's organizational standing to challenge election laws. The Fourth Circuit held that the RNC and North Carolina Republican Party had standing to challenge North Carolina's failure to comply with federal law regarding voter-registration forms. *See Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 399 (4th Cir. Oct. 29, 2024). In that case, the RNC alleged that the State's actions "directly impact Plaintiffs' core organizational missions of election security and

providing services aimed at promoting Republican voter engagement and electing Republican candidates for office." *Id.* at 396-97. The Fourth Circuit analogized those injuries to *Havens*. Just as in *Havens*, where "the plaintiff's core mission included counseling low-and moderate-income home buyers," the "core mission of the RNC and the NVGOP is to counsel voters to support Republican candidates." *Id.* at 397. Here, Plaintiffs have alleged that Nevada's post-election deadline harms the Plaintiffs' ability to do just that. This case, just like the RNC's challenge to North Carolina's election laws, "involves more than simply an organization's efforts to 'spend its way into standing.'" *Id.* at 396 (quoting *Havens Realty*, 455 U.S. at 394).

The Fifth Circuit agrees. This year, the RNC challenged Mississippi's law permitting mail ballots to be received up to five business days after the election. On summary judgment, the Secretary of State and intervenors challenged the RNC's standing. The district court rejected their arguments in a thorough opinion. "The RNC and the Mississippi Republican Party have established that they suffered concrete injuries in the form of economic loss and diversion of resources." *RNC v. Wetzel*, 2024 WL 3559623, at *5. On appeal, no party challenged the district court's ruling that the RNC and Mississippi Republican Party had organizational standing. *See RNC v. Wetzel*, 120 F.4th at 205 n.3. But each court "has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). And in a case that is virtually identical to this one, the Fifth Circuit concluded that "[j]urisdiction is proper" because "this case fits

comfortably within our precedents." *RNC v. Wetzel*, 120 F.4th at 205 & n.3 (citing *OCA-Greater Hous.*, 867 F.3d at 610; *Vote.Org*, 89 F.4th at 471).

The district court's decision in this case splits with the Fourth and Fifth Circuits. The district court recognized that Nevada's revised mail-ballot receipt deadline "may require" Plaintiffs to "devote more resources to poll watching and election-integrity trainings" and to "mail ballot chase program[s]" after election day. ER-12. And the court acknowledged that by extending ballot receipt by four additional days, Nevada gave Plaintiffs "more work" to do and "more time" to do it. ER-11, 13. The district court likened Plaintiffs to "physicians" who "challenge the approval of a drug simply because more individuals might then show up in doctor's offices with follow-on injuries." ER-13 (cleaned up). "It is hard to take that analogy seriously" when the court is likening political parties to a "business saying that it is injured by a change in … law that created more business for it." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 954 (7th Cir. 2019) (refuting similar analogy to tax business). Extending election deadlines doesn't create more "business" for the RNC and NVGOP. *Id.* It creates more "work" for them to achieve their "specific mission" of electing their candidates. *Id.* Legislation that "force[s] them to reduce or eliminate their work in certain areas—voter education, get-out-the-vote efforts, and new registrations," to mitigate "a frustrated mission" imposes an organizational injury. *Id.* "Under *Havens*, those are concrete injuries." *Id.*

By comparing Plaintiffs to doctors, the district court misunderstood Plaintiffs' core political mission, which is "protecting the ability of Republican voters to cast, and

Republican candidates to receive, effective votes in Nevada elections and elsewhere," ER-22. "In a world of limited resources—that is, the real world—the Organizations must decide which tasks will achieve those goals most effectively." *Common Cause Ind.*, 937 F.3d at 954. Nevada's revised mail-ballot deadline "cause[s]" Plaintiffs "to curtail and divert resources away from specific activities and projects—registration of Republican voters and efforts to increase in-person turnout—in order to perform more extensive and expensive ballot-chasing and poll-watching efforts necessitated by the acceptance of absentee ballots received after election day." *RNC v. Wetzel*, 2024 WL 3559623, at *4. Therefore, "by adding" new activities "to their workload," Nevada's extended mail-ballot deadline costs Plaintiffs "time and money they would have spent differently or not spent at all." *Common Cause Ind.*, 937 F.3d at 954.

Defendants might argue that these injuries are of Plaintiffs' own making and that Plaintiffs are engaging in a "self-help theory of standing" that this Court has rejected. *Ariz. All. for Retired Ams.*, 117 F.4th at 1175. To be sure, organizations cannot manufacture an injury by "voluntarily" spending money to educate voters about a law change, *id.*, or simply spending money "to gather information and advocate against" a government regulation, *All. for Hippocratic Med.*, 602 U.S. at 370. But Plaintiffs don't rely on those sorts of voluntary costs to help *third parties* avoid some harm. Instead, Plaintiffs allege that *they* "would have suffered some other injury" had they "not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).

The Plaintiffs' independent injury makes this case fundamentally different from *Arizona Alliance*. In that case, a voter registration organization was just trying to "register and educate voters" and challenged a state law that "could cause voters' current registrations—rather than old, outdated registrations—to be cancelled." *Ariz. All. for Retired Ams.*, 117 F.4th at 1178. But whether voters registrations were cancelled or not, "the plaintiffs can still register and educate voters—in other words, continue their core activities that they have always engaged in." *Id.* In contrast, the Plaintiffs here don't merely want to turn out voters in the abstract. They want to *maximize* Republican turnout relative to their competition so that they can "elect Republican candidates to state and federal office." ER-22.

In other words, unlike the voter-registration organization in *Arizona Alliance*, the Plaintiffs here compete for votes. And like college admissions, elections "are zero-sum," which is why "[a] benefit provided to [one] but not to others necessarily advantages the former … at the expense of the latter." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 218-29 (2023). Plaintiffs must chase mail ballots or risk losing elections. *See* ER-30-32. They are thus spending "resources offsetting" the harm to their "existing activities" to work to elect Republican candidates. *Ariz. All. for Retired Ams.*, 117 F.4th at 1175.

35

### 2. The Plaintiff organizations have plausibly alleged causation and redressability.

"[T]o establish causation, the plaintiff must show a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *All. for Hippocratic Med.*, 602 U.S. at 385. When that chain of events involves third parties, "the plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." *Id.* at 383 (citation omitted).

Here, it's "sufficiently predictable"—indeed, all but certain—that later mail deadlines will result in at least some voters returning their mail ballots at the last minute. *Id.* And as Plaintiffs allege, those late ballots "specifically and disproportionately harm[] Republican candidates," in part because "[m]ail ballots from Democratic voters … tend to arrive late." ER-22, 31. Even if those late ballots didn't harm Republican candidates directly—or even if voters didn't vote late at all—the Plaintiff organizations would still have to anticipate those "sufficiently predictable" events. *All. for Hippocratic Med.*, 602 U.S. at 383. That is, the post-election election deadline creates circumstances in which the Plaintiff organizations must organize their strategies and activities to account for late-arriving ballots *regardless* of whether those ballots actually arrive late or actually favor Plaintiffs' competitors. And courts generally don't "second-guess a candidate's reasonable assessment of his own campaign." *Becker v. FEC*, 230 F.3d 381, 387 (1st Cir.

2000) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)).

In response to Plaintiffs' injuries, the district court asserted that "[a]ny diversion of resources" by Plaintiffs to post-Election Day activities is nothing more than "business as usual" and thus not a "diversion" as contemplated by *Havens*. ER-11, 13 (cleaned up). But that reasoning inverts what this Court said in *Arizona Alliance*: courts "must not allow the diversion of resources *in response* to a policy to confer standing—instead, the organization must show that the new policy directly harms its *already-existing* core activities." 117 F.4th at 1177. Plaintiffs' "in-person Election Day get-out-the-vote activities," ER-29, are the "already-existing core activities" that are harmed by extending *mail*-voting deadlines, *Ariz. All. for Retired Ams.*, 117 F.4th at 1177. With limited resources, the Plaintiff organizations must choose one or the other. They cannot pursue both effectively.

Moreover, "the causation inquiry can be heavily fact-dependent and a 'question of degree.'" *All. for Hippocratic Med.*, 602 U.S. at 384. That fact-dependent inquiry makes causation easy to plead in a complaint, particularly because *Havens* does not require Plaintiffs to prove "a seismic shift from work within [their] mission to work outside of it" to support Article III standing. *Common Cause Ind.*, 937 F.3d at 954. The district court admitted that Nevada's law would result in "additional expenditures" for Plaintiffs, ER-11, which is good evidence that the law burdens Plaintiffs' core political activities with

an "added cost," *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 189 n.7 (2008).

As for redressability, "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *All. for Hippocratic Med.*, 602 U.S. at 381. The Plaintiffs here request an order declaring ballots arriving after election day invalid, and enjoining Defendants from enforcing Nevada's post-election receipt deadline. "Such an order would address Plaintiffs' alleged injury and permit them to reallocate their resources accordingly." *RNC v. N.C. State Bd. of Elections*, 120 F.4th at 398. The district court didn't suggest otherwise.

### 3.    The district court analyzed the wrong injuries.

Reversal is also warranted because the district court "misunderstood the nature of the injury-in-fact alleged to have been suffered by [Plaintiffs]." *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 871 (9th Cir. 2002). The district court claimed that Plaintiffs had not presented "evidence" that they "would not round up mail ballots in substantially the same manner if they were due at county clerks' offices on Election Day instead of four days later." ER-11. But that was not the injury Plaintiffs pled. Rather, they alleged that because Nevada now allows for mail ballots to be received for a far longer period than in-person votes, Plaintiffs had to take away resources from their programs to "corral[] in-person voters on Election Day" and divert those resources to "running mail ballot collection operations" for a longer period through Election Day. ER-11; *see also* ER-22-23, 29. Plaintiffs did not claim that they had to round up mail

ballots in a different manner due to Nevada's revised mail-ballot deadline. The district court came up with that allegation on its own. Because "the court's focus" was on the wrong injury, the district court's entire standing analysis "was misplaced" and must be reversed. *Bernhardt*, 279 F.3d at 871.

The district court's "misunderstanding" of Plaintiffs' "alleged injury also led it to rely erroneously" on irrelevant precedent. *Id.* Specifically, the district court relied on a previous decision in *Donald J. Trump for President, Inc. v. Cegavske*, where the court concluded that allegations of voter confusion due to a later mail-ballot deadline do not suffice to establish an injury-in-fact. 488 F. Supp. 3d at 1001-02. But Plaintiffs don't allege voter confusion in this case. Rather, Plaintiffs allege that their on-the-ground activities are directly affected by rules that change the deadline for ballots. *See* ER-22-23, 32. From the outset of these proceedings, Plaintiffs made clear that "[t]his case is different" from *Cegavske*. ER-21. The district court ignored those differences.

The district court also faulted Plaintiffs for failing to allege "that the Nevada mail ballot receipt deadline harms the integrity of the mail ballot counting process, such as by increasing the risk of error or fraud." ER-13. But whether late-arriving ballots are fraudulent is beside the point. A post-election mail-ballot deadline requires the Plaintiff organizations to "divert more time and money to post-election mail ballot activities" such as observing "the handling and counting of mail ballots." ER-29. Nevada law requires election officials to "determine[]" the "date of the postmark," and count the ballot if it is "postmarked on or before the day of the election" and received within four

days after the election. Nev. Rev. Stat. §293.269921. But under an election-day deadline—that is, under federal law—the postmark is irrelevant; all ballots must be received by election day. A novel postmark rule requires Plaintiffs to "divert more time and money" to "observe the handling and counting of mail ballots," ER-29, by, for example, devoting "'additional poll-watcher coverage,' including training of poll watchers." *RNC v. Wetzel*, 2024 WL 3559623, at *4. The district court's reasoning "misses the thrust of plaintiffs' claims." *Maya v. Centex Corp.*, 658 F.3d 1060, 1071 (9th Cir. 2011). This Court should reverse.

## II. Plaintiff organizations have associational standing.

The RNC and NVGOP also have standing as a representative of their political-candidate members. An association "may have standing" to represent its members "[e]ven in the absence of injury" to itself. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). An association has standing when, among other things, one of its "members would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). And here, the RNC and NVGOP's candidates are injured because Nevada's law allows unlawful ballots to be counted in their races, and an order barring the counting of unlawful ballot would remedy their injury. Thus, the RNC and NVGOP have associational standing.[3]

---

[3] Defendants and the district court challenged associational standing on only one ground: whether the RNC had sufficiently pled that its members were injured. ER-13-14. No one contests that the RNC and NVGOP meet the other two requirements—germaneness and the absence of a need of participation of individual members. *Hunt*,

The RNC and NVGOP's candidates are injured when unlawful ballots are counted. "An inaccurate vote tally is a concrete injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1058 (9th Cir. 2020). No one doubts that candidates have standing to challenge unlawful ballots after the election. *See, e.g.*, *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924 (7th Cir. 2020). A "political candidate" suffers "a personal, distinct injury" when unlawful ballots are counted, or lawful ballots are excluded. *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (citing *Roe v. Alabama ex rel. Evans*, 43 F.3d 574, 578 (11th Cir. 1995)); *cf. Carney v. Adams*, 592 U.S. 53, 66 (2020) (holding that a plaintiff had not proved injury in fact where he was merely a potential candidate and had not yet applied for appointment to the position). These post-election disputes by candidates over the validity of ballots are well known in election litigation. *E.g.*, *Bush v. Gore*, 531 U.S. 98, 100 (2000).

The injury of late ballots is no less certain before the election. The district court itself recognized that Plaintiffs allege Nevada's "post-election receipt deadlines" allow Nevada "to count invalid votes," which "violates" Republican candidates' "rights to stand for office." ER-5. These "injuries are also imminent" because "the statute currently requires" four more days "for receipt, processing, and counting of absentee ballots following the next election in November." *RNC v. Wetzel*, 2024 WL 3559623, at

---

432 U.S. at 343. Those requirements are easily met anyway since election of their candidates is at the core of the RNC and NVGOP's missions, and they seek only declaratory and injunctive relief.

*5. Ballots received after election day are necessarily invalid because they violate the federal "day for the election." 2 U.S.C. §§1, 7; 3 U.S.C. §1. The Defendants dispute that conclusion, but "[f]or standing purposes, [courts] accept as valid the merits of [the plaintiff's] legal claims." *FEC v. Cruz*, 596 U.S. 289, 298 (2022). And "[i]f correct on the merits, as [the court] must assume for standing purposes, [Plaintiffs'] challenge presents a clearly redressable injury." *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012); *accord Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1189 (9th Cir. 2023) ("That petitioners' theory may fail on the merits does not mean petitioners lack standing to raise it.").

Courts have thus found that political committees have "associational standing" to represent their "party's candidate" in challenges to unlawful election rules. *Tex. Democratic Party*, 459 F.3d at 587. That principle is narrow, particularly as applied here: whatever injuries a candidate might suffer from other election regulations—such as ballot-casting procedures, fraud-prevention measures, or registration rules—there's no doubt that rules governing the validity of ballots can injure candidates. Because counting ballots received after election day necessarily results in an "inaccurate vote tally," which itself "is a concrete injury to candidates," *Carson*, 978 F.3d at 1058, candidates and their parties have standing to challenge State rules that require counting of these invalid ballots.

Plaintiffs represent numerous Republican candidates seeking election in Nevada. ER-22-23. Plaintiffs brought this suit "in a representational capacity to vindicate the

rights" of those "candidates" who are their members. ER-22-23. Plaintiffs pled that Nevada's revised mail-ballot deadline "violates the rights of candidates," ER-21, and argued that those candidates "have a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast," *Carson*, 978 F.3d at 1058.

But the district court determined that Plaintiffs' associational standing to vindicate the rights of Republican candidates did "not warrant discussion." ER-17. Indeed, the district court confined its analysis of associational standing to determining whether Plaintiffs had standing "on behalf of their members who vote in Nevada"— not the Republican candidates whom Plaintiffs represent. ER-14. The district court erred by refusing to examine Plaintiffs' associational standing to represent Republican candidates who are injured by Nevada's revised mail-ballot deadline. Plaintiffs plausibly pled that the candidates who are members of their organizations are directly injured by Nevada's revised mail-ballot deadline.

### III.  The district court improperly disputed Plaintiffs' factual claims.

Plaintiffs were only required to allege standing, not prove it, to survive a motion to dismiss. Standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. It is thus "significant" that this Court is "reviewing" the district court's grant of "a motion to dismiss, and not a summary judgment on the issue of standing." *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1178 (9th Cir. 2000). At the motion-to-dismiss stage,

"courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501.

But the district court required Plaintiffs to produce "evidence" of their injuries in response to the motions to dismiss. ER-11. Throughout its opinion, the court refused to accept Plaintiffs' plausible allegations and instead made factual findings that directly contradict the allegations in the Complaint. Plaintiffs alleged that they face competitive electoral harm due to Nevada's revised mail-ballot deadline. ER-32. But the district court concluded that the threat of competitive electoral harm is "entirely uncertain." ER-8. Plaintiffs provided sources for their claims about partisan and mail voting trends. ER-30-32. But the district court questioned the validity of those sources and demanded "more specific information about the timing of mail voting in Nevada." ER-7 n.4. Plaintiffs alleged that chasing mail ballots through election day was new business. ER-21, 33. But the district court found that it was "business as usual." ER-11 (cleaned up). Plaintiffs alleged that they must divert resources for ballot-counting observation. ER-29. But the district court was "not fully convinced [Plaintiffs] have imminent plans to hold these trainings and hire poll workers." ER-12 n.7. Plaintiffs alleged that they must spend additional time and money in response to Nevada's revised mail-ballot deadline. ER-29. But the district court ruled that "additional time and money will *not* be expended 'in response to'" Nevada's revised mail-ballot deadline. ER-12 (emphasis added) (citation omitted).

The district court also relied on its own speculation about why the Plaintiffs' factual allegations *might not* be true. Plaintiffs claimed that they must divert funding from in-person turnout to run mail-ballot operations through election day. ER-29. But the district court found that "[t]he record is devoid of evidence" that Plaintiffs couldn't "just conduct those same activities a few days earlier in November or over a shortened period of time." ER-11. Plaintiffs provided detailed claims of partisan and mail voting trends. ER-30-31. But the district court speculated that "[s]ome affected voters might choose to forgo voting altogether," or "other factors" might mean that things play out differently. ER-11. Subjecting the Plaintiffs to this heighted burden at the pleading stage warrants reversal. *See Warth*, 422 U.S. at 501.

The district court's application of an improper standard was confirmed by its conversion of Defendants' motions to dismiss from a "facial attack" into a "factual attack" on Plaintiffs' "jurisdictional allegations." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). "When the Rule 12(b)(1) motion is facial, i.e., based solely on the allegations of the complaint," Plaintiffs have "no evidentiary burden." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016); *accord Leite*, 749 F.3d at 1121. The district court relied on *Friends of the Earth v. Sanderson Farms* to support its conclusion that Plaintiffs are "[e]ngaging in the same mail ballot collection push with slightly different timing," which is a "'continuation of existing advocacy,' not an 'affirmative diversion of resources.'" ER-11 (quoting *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 943 (9th Cir. 2021)). But *Friends of the Earth* was a *factual* challenge to plaintiffs'

45

standing that the district court considered only after "extensive discovery" had taken place. 992 F.3d at 943. The district court's misplaced reliance on *Friends of the Earth* shows that it improperly imposed an evidentiary burden upon Plaintiffs at the pleading stage by treating Defendants' motion to dismiss as a factual—not facial—challenge to Plaintiffs' standing.

If allowed to stand, the district court's jurisdictional ruling on the pleadings converts organizational standing into an impossible standard. *Alliance for Hippocratic Medicine*, after all, was a decision on a "preliminary injunction" motion. 602 U.S. at 377. *Arizona Alliance* also concerned a "preliminary injunction." 117 F.4th at 1169. Those plaintiffs thus faced a heighted *evidentiary* burden to show organizational injury. *See All. for Hippocratic Medicine*, 602 U.S. at 391. In contrast, *Havens* held that the plaintiffs' *two-sentence* allegation was sufficient to allege an Article III injury: "Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." 455 U.S. at 379 (cleaned up). Even under that single "broadly alleged" claim, there was "no question that the organization has suffered injury in fact." *Id.* The complaint here includes far more detail about what activities are harmed, how those activities are harmed, and how the Plaintiff organizations must divert resources to counteract those harms. The district court erred by requiring more. *See Warth*, 422 U.S. at 501.

### IV. In the alternative, the Court should remand with instructions to enter dismissal without prejudice.

Even setting aside its erroneous standing decision, the district court should have allowed Plaintiffs to amend their complaint. "In general, dismissal for lack of subject matter jurisdiction is without prejudice." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017). That's because "[c]laims should be dismissed with prejudice only when it is clear that no amendment could cure a defect in the complaint." *City of Oakland v. Hotels.com LP*, 572 F.3d 958, 962 (9th Cir. 2009). Even if this Court disagrees that the complaint alleges a concrete injury, at least "[i]n theory," the "Plaintiffs could allege … facts that might support standing." *Koster*, 847 F.3d at 656. Indeed, *RNC v. Wetzel* proves that these same Plaintiffs can not only plead an organizational injury—they can also prove that injury on summary judgment. 120 F.4th at 205 & n.3. "As a result, the complaint should have been dismissed *without* prejudice." *Koster*, 847 F.3d at 656.

At best, the district court's order and judgment are unclear. The court granted the Defendants' motions to dismiss because it found that "Plaintiffs have failed to demonstrate that the Court has standing to exercise jurisdiction over this case." ER-17. The opinion simply says, "The Clerk of Court is directed to close this case and enter judgment accordingly." ER-17. The final judgment says the same thing: the "motions to dismiss" are "granted," and "judgment is hereby entered accordingly and this case is closed." ER-3.

In this situation, this Court regularly remands to "order the district court to modify its decision to specify that [the plaintiffs'] claim is 'dismissed without prejudice.'" *Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 847 (9th Cir. 1999). Even when this Court "affirm[s] the dismissal for lack of subject matter jurisdiction," it will "remand so that the dismissal is without prejudice." *Hotels.com*, 572 F.3d at 962; *see also, e.g.*, *Kelly v. Fleetwood Enters.*, 377 F.3d 1034, 1040 (9th Cir. 2004) ("AFFIRMED with instructions to the district court to enter an order of dismissal without prejudice."); *Koster*, 847 F.3d at 656 (same). "Nothing in this case suggests a reason to depart from this general rule." *Hotels.com*, 572 F.3d at 962.

## CONCLUSION

For these reasons, this Court should reverse the district court's judgment or, in the alternative, remand with instructions to enter dismissal without prejudice.

DATED this 20th day of November, 2024    Respectfully submitted,

/s/ *Thomas R. McCarthy*

Jeffrey F. Barr
ASHCRAFT & BARR LLP
8275 South Eastern Ave., Ste. 200
Las Vegas, NV 89123
(702) 631-4755
barrj@ashcraftbarr.com

David A. Warrington
Gary M. Lawkowski
DHILLON LAW GROUP, INC.
2121 Eisenhower Ave., Ste. 608
Alexandria, VA 22314

Thomas R. McCarthy
Gilbert C. Dickey
Conor D. Woodfin
Thomas S. Vaseliou
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com
tvaseliou@consovoymccarthy.com

703-574-1206
DWarrington@dhillonlaw.com
GLawkowski@dhillonlaw.com

Michael A. Columbo
DHILLON LAW GROUP, INC.
177 Post St., Ste. 700
San Francisco, California 94108
MColumbo@dhillonlaw.com

Sigal Chattah
CHATTAH LAW GROUP
5875 S. Rainbow Blvd #204
Las Vegas, NV 89118
(702) 360-6200
sigal@thegoodlawyerlv.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that according to the word-count feature of the word processing program used to prepare this brief, this brief contains 12,353 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rule 32(a)(1)–(7) and Circuit Rules 32, 32-1.

*/s/ Thomas R. McCarthy*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing brief on November 20, 2024, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system, which will serve all parties requiring notice.

*/s/ Thomas R. McCarthy*

## CERTIFICATE OF PAPER COPIES

I certify that the paper copies of this brief are identical to the electronic version.

*/s/ Thomas R. McCarthy*