No. 24-5071

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

REPUBLICAN NATIONAL COMMITTEE, *et al.*,
PLAINTIFFS-APPELLANTS,

V.

CARI-ANN BURGESS, in her official capacity as the Washoe County Registrar of
Voters, *et al.*,
DEFENDANTS-APPELLEES,

VET VOICE FOUNDATION, *et al.*,
INTERVENOR-DEFENDANTS-APPELLEES.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA
No. 3:24-cv-198, Hon. Miranda M. Du

———————————

**BRIEF OF THE DISTRICT OF COLUMBIA, CALIFORNIA, COLORADO,
CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MARYLAND,
MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW JERSEY, NEW
YORK, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON AS
AMICI CURIAE IN SUPPORT OF APPELLEES**

———————————

BRIAN L. SCHWALB
Attorney General
District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

MARK A. RUCCI
Assistant Attorney General

400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI CURIAE.....................................1

SUMMARY OF ARGUMENT ...............................................................................3

ARGUMENT .........................................................................................................4

    I.     Many States Have Exercised Their Flexibility In Designing Electoral Systems To Permit Receiving And Counting Absentee Votes After Election Day, Which Responds To The Needs Of Their Voters.......................................................................................4

          A.    Absentee voting has a long history in this country ....................5

          B.    Most states and the District of Columbia count at least some absentee ballots mailed on or before election day if they arrive after election day.......................................................8

          C.    These ballot-receipt deadlines respond to voter needs and maximize voter participation ....................................................13

    II.    Nevada's And Other States' Receipt-Deadline Statutes Fit Into The Legal Framework Envisioned By The Constitution And The Federal Election Statutes ....................................................................17

CONCLUSION ...................................................................................................23

## TABLE OF AUTHORITIES

### *Cases*

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013).................... 19, 20

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989)...................22

*Bush v. Gore*, 531 U.S. 98 (2000).................................................................20

*Chase v. Miller*, 41 Pa. 403 (1862) ...............................................................7

*Ex parte Yarbrough*, 110 U.S. 651 (1884)................................................19

*Foster v. Love*, 522 U.S. 67 (1997)....................................... 18, 19, 20, 21

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012)..................................19

*Gregory v. Ashcroft*, 501 U.S. 442 (1991)..................................................1

*Moore v. Harper*, 600 U.S. 1 (2023) ..................................................6, 16

*Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200 (5th Cir. 2024)........................11

*Reynolds v. Sims*, 377 U.S. 533 (1964).......................................................1

*Roudebush v. Hartke*, 405 U.S. 15 (1972) ..............................................18

*Shelby County v. Holder*, 570 U.S. 529 (2013) ...........................................1

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) ...........................................23

*Smiley v. Holm*, 285 U.S. 355 (1932) ......................................... 6, 13, 18

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) ......................................18

*Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169 (9th Cir. 2001)..............23

*Statutes*

2 U.S.C. § 1 ................................................................................1

2 U.S.C. § 7 .......................................................................... 18, 20

3 U.S.C. § 1 ...................................................................... 1, 18, 22

3 U.S.C. § 5 ................................................................................2

3 U.S.C. § 7 ................................................................................2

3 U.S.C. § 21 ........................................................................ 18, 22

10 Ill. Comp. Stat. 5/18A-15 ........................................................9

10 Ill. Comp. Stat. 5/19-8(c) .........................................................9

25 Pa. Cons. Stat. § 3511 ............................................................12

52 U.S.C. § 20302 ......................................................................22

52 U.S.C. § 20304 ......................................................................22

Act of Feb. 16, 1815, § 1, 1815 N.J. Laws 16-18 ............................7

Act of Mar. 29, 1813, ch. 171, 1813 Pa. Laws 213-14 .....................7

Ala. Code § 17-11-18 ..................................................................12

Alaska Stat. § 15.20.081 .............................................................10

Ark. Code. Ann. § 7-5-411 ..........................................................12

Cal. Elec. Code § 3020 ...............................................................10

D.C. Code § 1-1001.05 ...............................................................10

Fla. Stat. § 101.6952 ..................................................................12

Ga. Code Ann. § 21-2-386 ..................................................................12

Ind. Code § 3-12-1-17 .......................................................................12

Kan. Stat. Ann. § 25-1132 .................................................................10

Mass. Gen. Laws ch. 54, § 93 ...........................................................10

Md. Code Ann., Elec. Law § 11-302 .................................................12

Mich. Comp. Laws § 168.759a ..........................................................12

Miss. Code § 23-15-637 .....................................................................11

Mo. Rev. Stat. § 115.920 ...................................................................12

N.D. Cent. Code § 16.1-07-09 ...........................................................11

N.D. Cent. Code § 16.1-15-35 ...........................................................11

N.J. Stat. Ann. § 19:63- 22 ................................................................10

N.Y. Elec. Law § 8-412 .....................................................................10

Nev. Rev. Stat. § 293.269921 ..........................................................3, 9

Ohio Rev. Code Ann. § 3509.05.........................................................11

Or. Rev. Stat. § 254.470.....................................................................10

R.I. Gen. Laws § 17-20-16.................................................................12

S.C. Code Ann. § 7-15-700.................................................................12

S.C. Code Ann. § 7-17-10...................................................................12

Tex. Elec. Code Ann. § 86.007...........................................................11

Utah Code Ann. § 20A-3a-204...........................................................11

Utah Code Ann. § 20A-4-301 ...................................................................................11

Va. Code Ann. § 24.2-702.1 ...................................................................................10

Va. Code Ann. § 24.2-709 ......................................................................................10

W. Va. Code § 3-3- 5 .............................................................................................10

W. Va. Code § 3-6-9 ..............................................................................................10

Wash. Rev. Code § 29A.60.190 ..............................................................................9

### *Constitutional Provisions*

U.S. Const. art. I, § 4 ..................................................................................... 3, 6, 18

U.S. Const. art. II, § 1 .................................................................................... 3, 6, 18

### *Legislative Materials*

Cal. S. Rules Comm., Bill Analysis of S.B. 29 (Vote by Mail and Election
Result Statements), 2013-2014 Reg. Sess. (Aug. 26, 2014) ................................14

Cong. Globe, 42d Cong., 2d Sess. 141 (1871) .......................................................19

Kan. Conf. Committee Rep. Br., H.B. 2158, 2017 Sess. (Apr. 4, 2017) .................14

*Overseas Absentee Voting: Hearing on The Overseas Citizens Voting Rights*
*Act of 1975, The Federal Voting Assistance Act of 1955 & S. 703 Before the*
*S. Comm. on Rules & Admin.*, 95th Cong. (1977) .............................................21

Primary Date Alteration Amendment Act of 2019, D.C. Council,
Report on Bill 23-212 (July 11, 2019) ...............................................................16

Tex. H.R. Comm. on Elections, Bill Analysis of Committee Substitute
House Bill (C.S.H.B.) 1151, 85th Reg. Sess. (Apr. 17, 2017) ...........................13

*Other Authorities*

Daniel R. Biggers & Michael J. Hammer, *Who Makes Voting Convenient? Explaining the Adoption of Early and No-Excuse Absentee Voting in the American States*, 15 State Pol. & Pol'y Q. 192 (2015)...........................................8

Election Assistance Comm'n, *Election Administration and Voting Survey 2022 Comprehensive Report* 9 (June 2023)..........................................14

John C. Fortier & Norman J. Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. Mich. J.L. Reform 483 (2003) 6, 7

Hannah Hartig et al., *As States Move to Expand the Practice, Relatively Few Americans Have Voted by Mail*, Pew Rsch. Ctr. (June 24, 2020) .......................14

Alex Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* (2000)...............................................................................5

Richard H. Pildes, *How to Accommodate a Massive Surge in Absentee Voting*, 2020 U. Chi. L. Rev. Online (June 26, 2020) ............................................. 14, 16

*Postelection Processes*, Nat'l Conf. of State Legislatures (Oct. 26, 2022)...............2

Press Release, Or. House Democrats, *House Democrats Expand Voting Rights for Oregonians* (May 24, 2021).................................................15

Press Release, Or. Senate Democrats, *Senate Democrats Expand Access to Oregon's Vote By Mail System*, (June 24, 2021) .................................................15

Michael Ritter, *Assessing the Impact of the United States Postal System and Election Administration on Absentee and Mail Voting in the 2012 to 2020 U.S. Midterm and Presidential Elections*, 22 Election L.J. 166 (2023) ...........7, 8

*Table 1: States with No-Excuse Absentee Voting*, Nat'l Conf. of States Legislatures (Dec. 20, 2023)................................8

*Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots*, Nat'l Conf. of State Legislatures (June 12, 2024) .................................2

*Table 2: Excuses to Vote Absentee*, Nat'l Conf. of States Legislatures (Oct. 7, 2024) .................................8

Olivia B. Waxman, *Voting by Mail Dates Back to America's Earliest Years. Here's How It's Changed Over the Years*, Time (Sept. 28, 2020) ........................5

Wendy R. Weiser & Harold Ekeh, *The False Narrative of Vote-by-Mail Fraud*, Brennan Ctr. (Apr. 10, 2020) ...............................................................................16

Hon. Samuel T. Worcester, *Hollis, New-Hampshire, In the War of the Revolution*, in 30 The New-Eng. Hist. & Genealogical Reg. 288 (1876) ............6

## INTRODUCTION AND INTEREST OF AMICI CURIAE

The District of Columbia, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington (collectively, "Amici States") file this brief as amici curiae in support of appellees.

In our federalist system, the Constitution leaves to the states the primary "power to regulate elections." *Shelby Cnty. v. Holder*, 570 U.S. 529, 543 (2013) (quoting *Gregory v. Ashcroft*, 501 U.S. 442, 461-62 (1991)). And each citizen's fundamental right to vote in those elections is "preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964). States thus employ different systems to guarantee both that their elections are run securely and efficiently and that their residents have free and fair access to the franchise.

To meet those objectives, states often balance competing interests. States must decide, among other things, how to count mail-in absentee ballots for federal elections that are postmarked on or before—but delivered after—the election day established by federal law. *See* 2 U.S.C. § 1; 3 U.S.C. § 1. On the one hand, states want to count all timely, legally cast votes. On the other hand, states must finish their vote counts and certify their results by certain deadlines, including those set by their own legislatures, *see Postelection Processes*, Nat'l Conf. of State Legislatures

(Oct. 26, 2022), tinyurl.com/m488ysea, and those set by Congress for the certification of presidential electors, 3 U.S.C. §§ 5, 7.

States have thus crafted varying election rules to determine which otherwise-timely absentee ballots to count when they arrive after polls close. *See Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots*, Nat'l Conf. of State Legislatures (June 12, 2024), tinyurl.com/23d993ft. As described in detail below, the District of Columbia and 18 geographically and politically diverse states generally count timely cast mail-in ballots so long as they arrive some specified number of days after election day. An additional ten states count mail-in ballots so long as they were cast by designated individuals residing outside the United States and arrive within a set number of days after election day. The other 22 states, in contrast, require all absentee ballots to arrive on or before the federally designated election day. Each state has thereby exercised its own considered judgment on how to best account for late-arriving but timely cast absentee ballots.

Under appellants' view of the law, however, Congress foreclosed any flexibility in the timing of receiving and counting absentee ballots sent by mail when it passed the federal election day statutes over 150 years ago. According to appellants, these statutes, which set the deadline to vote for federal office, do not allow states to receive and count votes after that date even when they are mailed by election day. They therefore assert that Nevada's mail-in ballot provisions—which

permit the state to count ballots up to four days after election day, so long as the ballot was postmarked on or before election day, and up to three days after election day if "the date of the postmark cannot be determined," Nev. Rev. Stat. §§ 293.269921(1)(b), (2)—violate federal law. This reading is wrong. States maintain the authority to set the "Times, Places and Manner of holding Elections" absent congressional preemption, U.S. Const. art. I, § 4, cl. 1; *see id.* art. II, § 1, cl. 2, and the federal election day statutes do not clearly preempt states' ability to determine when to receive and count votes that are timely cast by mail. Appellants' rule would also strip states of their long-held flexibility in administering elections and responding to the needs of the electorate. Amici States thus urge this Court, if it reaches the merits, to reject appellants' theory.

## SUMMARY OF ARGUMENT

I. States have the constitutional authority to make individualized judgments on how best to receive and count votes in federal elections. Using that authority, states have long adapted to the needs of their residents to maximize voter participation. Absentee voting is one such example. And as people began to vote by mail, states passed different laws establishing deadlines to receive those votes. States have chosen various deadlines to postmark and receive mail-in ballots, and they have selected which residents can make use of those deadlines. Currently, Nevada, along with 27 other states and the District of Columbia, count at least some

3

votes that are postmarked on or before—but received after—election day. Amici States recognize that these later ballot-receipt deadlines can increase voter participation and confidence, alleviate issues caused by postal congestion during election season, and ease burdens in administering elections, all without affecting election security.

II. These mail-in ballot receipt-deadline statutes are constitutional and are not preempted by federal law. The method for counting votes is left to the states unless Congress explicitly says otherwise. Congress has not enacted any law that regulates the deadline for receiving and counting votes. It has passed statutes that mandate which day federal elections must occur. But those laws require only that states conduct voting for federal offices on or by a designated day, and Nevada's and the other states' laws regulate receiving and counting of votes cast by that designated day. Moreover, Congress has legislated in the field of absentee voting but has been silent as to mail-in ballot receipt deadlines—implicitly approving states' varying practices in this area.

## ARGUMENT

### I. Many States Have Exercised Their Flexibility In Designing Electoral Systems To Permit Receiving And Counting Absentee Votes After Election Day, Which Responds To The Needs Of Their Voters.

Absentee voting has long existed as a way to increase voter participation. It first appeared in America before the Founding, became more common during and

after the Civil War, and entered the mainstream in the late 20th and early 21st centuries. As a necessary offshoot of increased absentee voting, states used their authority to regulate elections to set ballot-receipt deadlines, many of which fell after election day, so long as the ballots were mailed on or before election day. These receipt deadlines serve an important role in ensuring maximal voter participation and minimal voter distrust.

### A.  Absentee voting has a long history in this country.

Absentee voting is not new. From early instances before the Founding to wartime fixes to modern laws, there is a robust history in this nation of absentee voting. States have enacted these varying laws—from early proxy voting to present-day mail-in ballot voting—to respond to voters' needs and maximize voter participation.

Early forms of absentee voting, while not widespread, date back to colonial times. In 17th-century Massachusetts, according to one historian, men could vote remotely "if their homes were 'vulnerable to Indian attack.'" Olivia B. Waxman, *Voting by Mail Dates Back to America's Earliest Years. Here's How It's Changed Over the Years*, Time (Sept. 28, 2020) (quoting Alex Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* (2000)), tinyurl.com/mr7rn56e. And in 1775, in the town of Hollis, New Hampshire, election authorities allowed soldiers who were away fighting in the Continental Army to vote

5

"as if the men were present themselves."  Hon. Samuel T. Worcester, *Hollis, New-Hampshire, In the War of the Revolution*, in 30 The New-Eng. Hist. & Genealogical Reg. 288, 293 (1876), tinyurl.com/47ryjnd4.

Following American Independence, rather than create a rigid, national election system, the Framers allowed states to set the rules for federal elections.  *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2; *see also Moore v. Harper*, 600 U.S. 1, 29 (2023) (noting states' "constitutional duty to craft the rules governing federal elections").  Thus, the states maintain constitutional "authority to provide a complete code for congressional elections, not only as to times and places, but in relation to . . . [the] counting of votes." *Smiley v. Holm*, 285 U.S. 355, 366 (1932).  Early in the nation's history, states used that authority to allow military voters to cast ballots from afar.  For instance, Pennsylvania "passed the Military Absentee Act in 1813 to allow members of the state militia and those in the service of the United States to vote as long as the company the solider was serving was more than two miles from his polling place on election day."  John C. Fortier & Norman J. Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. Mich. J.L. Reform 483, 497 (2003) (citing Act of Mar. 29, 1813, ch. 171, 1813 Pa. Laws

6

213-14).  Similarly, in 1815, New Jersey passed an act "to allow soldiers to vote in the field."  *Id.* at 497 n.72 (citing Act of Feb. 16, 1815, § 1, 1815 N.J. Laws 16-18).[1]

During the Civil War, with soldiers far from home, states again permitted absentee voting, with several states using their authority to regulate elections to allow soldiers to vote by mail or proxy.  Fortier & Ornstein, *supra*, at 500; *see also* Michael Ritter, *Assessing the Impact of the United States Postal System and Election Administration on Absentee and Mail Voting in the 2012 to 2020 U.S. Midterm and Presidential Elections*, 22 Election L.J. 166, 168 (2023).  After the Civil War, more states adopted military absentee systems, and some expanded their systems to civilians.  By 1913, Vermont, Kansas, Missouri, and North Dakota all experimented with some form of absentee voting.  Fortier & Ornstein, *supra*, at 501-02.  By 1917, "24 of the then 48 states had enacted absentee ballot laws" due to "the increased mobility of American workers" and the country's "participation in World War I." *Id.* at 504.  And "[b]y 1924, there were only three states without absentee ballot legislation." *Id.*  These statutes usually required a reason to vote from afar, such as military service, professional requirements, university attendance, illness, or inability to reach a polling place.  *Id.* at 504-05.

---

[1]     Pennsylvania's law was later struck down on state constitutional grounds, *see Chase v. Miller*, 41 Pa. 403, 427-29 (1862), and New Jersey repealed its law five years after its enactment, *see* Fortier & Ornstein, *supra*, at 497 n.72.

By the 1970s, many states had enacted "absentee or mail voting laws that permitted individuals to cast ballots from home—in part to make voting more convenient for individuals." Ritter, *supra*, at 168. By the mid-1980s, western states like California, Oregon, and Washington had adopted absentee ballots for all eligible voters. Daniel R. Biggers & Michael J. Hammer, *Who Makes Voting Convenient? Explaining the Adoption of Early and No-Excuse Absentee Voting in the American States*, 15 State Pol. & Pol'y Q. 192, 199 (2015). Several more states joined throughout the 1990s and 2000s. *Id.* Today, 36 states and the District of Columbia offer no-excuse absentee voting to all of their residents, *Table 1: States with No-Excuse Absentee Voting*, Nat'l Conf. of States Legislatures (Dec. 20, 2023), tinyurl.com/2p9apmzh, while 14 states allow absentee voting to voters with a valid excuse, *Table 2: Excuses to Vote Absentee*, Nat'l Conf. of States Legislatures (Oct. 7, 2024), tinyurl.com/4cefy9ba.

In short, from the Founding to the present day, states have exercised their authority to administer elections to enact various forms of absentee voting in federal elections to respond to the needs of their residents and maximize voter turnout.

### B. Most states and the District of Columbia count at least some absentee ballots mailed on or before election day if they arrive after election day.

In exercising their judgment to establish election rules for federal elections, states have enacted absentee ballot laws that establish deadlines by which to receive

8

those ballots. Nevada enacted two such provisions, which permit the state to count mail-in ballots that are "[p]ostmarked on or before the day of the election" and "[r]eceived by the clerk not later than 5 p.m. on the fourth day following the election." Nev. Rev. Stat. § 293.269921(1). If the "date of the postmark cannot be determined," Nevada law permits the state to count the mail-in ballot if it is "received by mail not later than 5 p.m. on the third day following the election." *Id.* § 293.269921(2). These ballot-receipt deadlines are not unique. Most states and the District of Columbia count at least some otherwise valid mail-in ballots that arrive after election day, so long as those ballots were postmarked or certified on or before election day.

In addition to Nevada, 17 states and the District of Columbia count otherwise-timely mail-in ballots received after election day, no matter who cast them. Of those states, most require mailing on or before election day, but set various deadlines for ballots to be received. Washington counts ballots that "bear[] a postmark on or before the date" of the election and that are "receive[d] no later than the day before certification," which occurs 21 days after the election. Wash. Rev. Code § 29A.60.190. Illinois counts ballots that are "postmarked no later than election day" and received "before the close of the period for counting provisional ballots," 10 Ill. Comp. Stat. 5/19-8(c), meaning up to 14 days after election day, *id.* 5/18A-15. Alaska and the District of Columbia count ballots received up to ten days after

election day. Alaska Stat. § 15.20.081(e); D.C. Code § 1-1001.05(a)(10B). California and Oregon each count ballots postmarked on or before election day and received up to seven days after election day, Cal. Elec. Code § 3020(b); Or. Rev. Stat. § 254.470(6)(e)(B), while New York extends the deadline to seven days so long as the ballots are "in envelopes showing a cancellation mark of the United States postal service or a foreign country's postal service, or showing a dated endorsement of receipt by another agency of the United States government, with a date which is ascertained to be not later than the day of the election," N.Y. Elec. Law § 8-412(1). New Jersey counts ballots postmarked by election day that are received "within 144 hours [6 days] after the time of the closing of the polls," N.J. Stat. Ann. § 19:63-22(a), and West Virginia requires receipt within five days, W. Va. Code § 3-3-5(g)(2) (requiring receipt by the day of canvassing, which is five days after election day, W. Va. Code § 3-6-9(a)(1)). And Kansas, Massachusetts, and Virginia count ballots received three days after election day. Kan. Stat. Ann. § 25-1132(b) (requiring a postmark before the close of polls on election day); Mass. Gen. Laws ch. 54, § 93 (requiring a postmark by election day); Va. Code Ann. §§ 24.2-702.1(B), -709(B) (same).[2]

---

[2]    So too in Mississippi, where the legislature enacted an absentee ballot provision that permitted the state to count ballots that were "postmarked on or before the date of the election" and "received by the registrar no more than five (5) business

To qualify for the later deadline, some states require the ballots to be postmarked *before* election day. Ohio, for example, counts ballots received "through the fourth day" after the election, if they were postmarked "prior to the day of the election." Ohio Rev. Code Ann. § 3509.05(D)(2)(a). And Texas will count votes that arrive "not later than 5 p.m. on the day after election day," so long as they were "placed for delivery by mail or common or contract carrier before election day and bear[] a cancellation mark of a common or contract carrier or a courier indicating a time not later than 7 p.m. at the location of the election on election day." Tex. Elec. Code Ann. § 86.007(a)(2).

Additionally, some states offer more open-ended receipt guidelines. For its part, Utah accepts ballots "clearly postmarked before election day" and "received in the office of the election officer before noon on the day of the official canvass following the election," Utah Code Ann. § 20A-3a-204(2)(a), which must take place between seven and 14 days after the election, *id.* § 20A-4-301(1)(b). Likewise, North Dakota counts ballots postmarked before election day if they are received before canvassing, N.D. Cent. Code § 16.1-07-09, which occurs "[n]ot later than seventeen days next following" the election, *id.* § 16.1-15-35. And Maryland law

---

days after the election." Miss. Code Ann. § 23-15-637(1)(a). In *Republican National Committee v. Wetzel*, a panel of the United States Court of Appeals for the Fifth Circuit held that the Mississippi statute was preempted by federal law fixing a uniform time for appointing presidential electors. 120 F.4th 200 (5th Cir. 2024). A petition for rehearing en banc is currently pending in that case.

provides that mail-in ballots generally are timely if received in accordance with regulations and guidelines established by the State Board of Elections. Md. Code Ann., Elec. Law § 11-302(c)(1).

Finally, several states that do not accept late-arriving absentee ballots for all eligible voters still accept such ballots from some eligible voters. Specifically, ten states count ballots received after election day if cast by overseas voters.[3] Of these states, Arkansas, Florida, and Indiana have extended the receipt deadline to ten days after election day. Ark. Code. Ann. § 7-5-411(a)(1)(A)(ii); Fla. Stat. § 101.6952(5); Ind. Code § 3-12-1-17(b). Alabama, Pennsylvania, and Rhode Island provide seven days, Ala. Code § 17-11-18(b); 25 Pa. Cons. Stat. § 3511(a); R.I. Gen. Laws § 17-20-16, while Michigan provides six days, Mich. Comp. Laws § 168.759a(18). Georgia and Missouri set their deadlines on the Friday after election day, or three days later. Ga. Code Ann. § 21-2-386(a)(1)(G); Mo. Rev. Stat. § 115.920(1). And South Carolina sets its deadline for only "valid military-overseas ballot[s]" at "the close of business on the business day before the county canvass," S.C. Code Ann. § 7-15-700(A), which is the Friday after election day, *id.* § 7-17-10.

All told, then, 28 states and the District of Columbia currently exercise their constitutional authority to decide the best strategy for the "counting of votes" by

---

[3] The states that allow ballots to arrive after election day for *all* voters often also have statutes that more specifically cover overseas voters.

extending the receipt deadline for some absentee votes. *Smiley*, 285 U.S. at 366. Although these states have enacted rules that provide different deadlines—from one to 20 days—and encompass different groups of voters, each has made a judgment to provide for the counting of at least some legally cast ballots mailed by election day but arriving after election day.

### C. These ballot-receipt deadlines respond to voter needs and maximize voter participation.

Extending the deadline to count mail-in ballots provides benefits to states and their residents, with little downside. To start, these statutes promote voter participation. This point is partially self-evident: counting more legally cast votes means more legally cast votes will count. *See, e.g.*, Tex. H.R. Comm. on Elections, Bill Analysis of Committee Substitute House Bill (C.S.H.B.) 1151, 85th Reg. Sess., at 1 (Apr. 17, 2017), tinyurl.com/yrvutp46 ("Interested parties contend that accepting mail ballots until the day after election day will ensure that a greater number of voters are able to cast a vote that is counted.").

Extending ballot-receipt deadlines has become especially important as more people vote absentee. As discussed, state laws permitting no-excuse absentee voting have multiplied in recent years. So too has voters' utilization of absentee voting. Between 1996 and 2016, the share of ballots cast by mail rose from 7.8 percent to 20.9 percent. Hannah Hartig et al., *As States Move to Expand the Practice, Relatively Few Americans Have Voted by Mail*, Pew Rsch. Ctr. (June 24, 2020),

tinyurl.com/bddek5wu. Mail-in voting increased even more during the 2020 elections because of the COVID-19 pandemic, and has maintained popularity since, with 31.9 percent of votes cast in the 2022 elections by mail. Election Assistance Comm'n, *Election Administration and Voting Survey 2022 Comprehensive Report* 9, 33-34 (June 2023), tinyurl.com/yc3z3pry.

Voting absentee by mail, however, shifts some of the voting process from voting machines to the postal system. Statutes like Nevada's help mitigate the risks of that shift. Post offices need several days to deliver ballots in ideal circumstances, and as more voters cast ballots by mail, the post office will only need more time. *See* Richard H. Pildes, *How to Accommodate a Massive Surge in Absentee Voting*, 2020 U. Chi. L. Rev. Online (June 26, 2020), tinyurl.com/yckff79e. Indeed, proponents of California's three-day extension for absentee ballots to arrive cited "closures of several post offices and mail processing facilities [that] had the effect of slowing mail delivery in many jurisdictions." Cal. S. Rules Comm., Bill Analysis of S.B. 29 (Vote by Mail and Election Result Statements), 2013-2014 Reg. Sess., at 5 (Aug. 26, 2014), tinyurl.com/u5mwxnht. Proponents of the Kansas bill permitting ballots to be counted if received three days after election day likewise cited "mail delays" due to "reduc[tions in] the number of mail processing centers," which then "affected whether advance ballots are being counted." Kan. Conf. Committee Rep. Br., H.B. 2158, 2017 Sess., at 6-7 (Apr. 4, 2017), tinyurl.com/2s3rtpz5.

The policies also help voters with busy schedules or who have less access to polling places. As one Oregon state senator explained, "[l]ife circumstances, busy schedules, caretaking responsibilities and travel can inhibit eligible and engaged voters from getting their ballots through the mail system on time," so extending the deadline for mail-in ballots to arrive "will give voters with mobility issues, who lack transportation, who live in rural locations, or have exceptional responsibilities and busy lives . . . all opportunities to cast their ballot and participate in democracy." Press Release, Or. Senate Democrats, *Senate Democrats Expand Access to Oregon's Vote By Mail System*, (June 24, 2021) (quoting then-Oregon Senate Majority Leader Rob Wagner), tinyurl.com/5n7bd8wy. To that end, proponents of the Oregon bill believed it would especially "impact[] several vulnerable populations, including rural areas, low-income folks, and Black, Indigenous and communities of color who face increased barriers to voting." Press Release, Or. House Democrats, *House Democrats Expand Voting Rights for Oregonians* (May 24, 2021), tinyurl.com/9jpk7fph.

Given these benefits, later deadlines for receiving timely mailed ballots also provide comfort to the voting public that election results reflect the will of the people. As more people vote by mail, the postal service will be more likely to experience delays, leading to more ballots rejected as late. This higher rate of rejected ballots could, in turn, lead to more claims of election interference in those

states.  *See* Pildes, *supra* ("[A] 3 percent rejection rate risks undermining the perceived legitimacy of the election if 70 percent of the vote is cast by absentee ballot.").  By increasing the number of legally cast votes that are counted in an election, states can avoid claims that they are ignoring or excluding certain voters.

Finally, in addition to benefiting voters, extending receipt deadlines also benefits states, which are tasked with administering elections and counting votes. "Elections are complex affairs," *Moore*, 600 U.S. at 29, and extending receipt deadlines eases the burdens of election administration by giving states more time on both ends of election day to count all the legally cast votes.  The D.C. Council, for example, observed that voters sometimes requested their absentee ballots very close to election day, thus leaving little time for the District to send ballots and voters to fill out and return ballots by election day.  *See* Primary Date Alteration Amendment Act of 2019, D.C. Council, Report on Bill 23-212, at 4 (July 11, 2019), tinyurl.com/437uhpxm.  The Council chose to partially "ameliorate[] this hardship by allowing [the board] to receive absentee ballots up to seven days after an election, rather than by 8 p.m. on Election Day, thereby giving all District residents an opportunity to have their absentee vote counted." *Id.*

Compared with these many benefits for voters and states, extended receipt deadlines have little downside.  Absentee voting, like all voting, is rarely fraudulent. Wendy R. Weiser & Harold Ekeh, *The False Narrative of Vote-by-Mail Fraud*,

16

Brennan Ctr. (Apr. 10, 2020), tinyurl.com/4tm7zpvw (discussing an investigative analysis that "identified only 491 cases of absentee ballot fraud from 2000 to 2012," among millions of ballots cast).  And these statutes do not prevent states from using their typical tools to prevent voter fraud.  *See id.*

Moreover, these extended deadlines have not caused any issues with timely completing vote counting.  Some of these statutes have existed for decades, yet Amici States are unaware of a single instance where these ballot-receipt deadlines have caused a state to miss any election-certification deadlines.  Of course, if receipt deadlines interfere with timely certification, states retain their authority to amend their laws, and Congress retains its authority to preempt or supplement them if necessary.  Federal courts, however, should not make that policy decision for states and Congress.

## II. Nevada's And Other States' Receipt-Deadline Statutes Fit Into The Legal Framework Envisioned By The Constitution And The Federal Election Statutes.

Nevada, which—like the majority of states—allows some ballots received after election day to be counted, is not violating federal law.  Instead, Nevada's receipt-deadline statutes fit neatly into the election framework that both the Constitution's Framers and the federal election statutes' drafters created.

The regulation of federal elections is a federal power delegated to the states because "the Framers recognized that state power and identity were essential parts

of the federal balance." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 841 (1995) (Kennedy, J., concurring). Thus, "the Constitution is solicitous of the prerogatives of the States, even in an otherwise sovereign federal province." *Id.* In other words, the Constitution "invests the States with responsibility for the mechanics of [federal] elections, but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted); *see Roudebush v. Hartke*, 405 U.S. 15, 24 (1972) ("Unless Congress acts, Art. 1, § 4, empowers the States to regulate."). For congressional elections, states have the authority to regulate their "Times, Places and Manner," unless preempted or supplemented by Congress. U.S. Const. art. I, § 4, cl. 1. And states establish the "Manner" of choosing presidential electors, *id.* art. II, § 1, cl. 2, while Congress "determine[s] the Time of chusing the Electors, and the Day on which they shall give their Votes," *id.* art. II, § 1, cl. 4. Among the "Manner[s]" left for the states to decide is how to best conduct the "counting of votes." *Smiley*, 285 U.S. at 366. Through receipt-deadline statutes, states have made individualized choices on how to best receive and count votes timely cast by mail in federal elections.

Congress did not preempt these state provisions through the election day statutes. These two laws "establish[] . . . the day for the election" of the members of the House, 2 U.S.C. § 7, and the "election day" for the presidential electors, 3 U.S.C. §§ 1, 21(1), as the Tuesday after the first Monday in November in certain years. In

enacting the original versions of these statutes, Congress used its power under the Elections and Electors Clauses to override state law on the dates of federal elections. *Foster*, 522 U.S. at 69. It chose to act "to remedy more than one evil arising from the election of members of Congress occurring at different times in the different States." *Id.* at 73 (quoting *Ex parte Yarbrough*, 110 U.S. 651, 661 (1884)). More precisely, Congress was concerned with the fact that some states were voting earlier than others, leading to elections being effectively decided by those earlier voting states. *Id.* at 73-74; *see* Cong. Globe, 42d Cong., 2d Sess. 141 (1871) (remarks of Rep. Butler) ("Unless we do fix some time at which, as a rule, Representatives shall be elected, it will be in the power of each State to fix upon a different day, and we may have a canvass going on all over the Union at different times. It gives some States undue advantage.").

Nothing in the text of these statutes, however, suggests that states are prohibited from receiving and counting ballots that were indisputably mailed on or before election day. One limitation on state electoral systems is that "the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them." *See Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) (en banc). But setting a time to hold an election is not the same as setting a deadline to receive and count the votes cast in that election. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14 (2013) ("Because the power the

Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent."). "[T]here is no compelling reason not to read Elections Clause legislation simply to mean what it says." *Id.* at 15.

Moreover, extended receipt deadlines are consistent with the Supreme Court's decision in *Foster*. There, the Court held that a Louisiana law that allowed "a contested selection of candidates for a congressional office" to "conclude[] as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress, clearly violates [2 U.S.C.] § 7." *Foster*, 522 U.S. at 72. Determining that an election is "the combined actions of voters and officials meant to make a final selection of an officeholder," the Supreme Court held that the federal statutes required "only that if an election does take place, it may not be consummated prior to federal election day." *Id.* at 71-72 & n.4 (emphasis added). This holding does not require—or even imply—that the receipt and counting of timely cast votes must end on federal election day. *Cf. Bush v. Gore*, 531 U.S. 98, 116 (2000) (Rehnquist, C.J., concurring) (observing that "[a]fter the election has taken place, the canvassing boards receive returns from precincts, [and] count the votes"). After all, absentee voters cast their votes by mailing their ballots no later than election day—at which point they are stuck with their choice, just like someone who drops their ballot in a box or pulls a lever in person. Under the receipt-deadline

statutes, then, voters must still "make a final selection of an officeholder" by election day. *Foster*, 522 U.S. at 71.

Finally, the history of federal inaction over ballot-receipt deadlines bolsters appellees' reading of the law. To be sure, Congress has declined to address ballot-receipt deadlines under federal law. Yet, for as long as states have been passing these laws, Congress has been aware of their existence and has chosen not to displace them.

For instance, during consideration of the 1977 amendments to various aspects of federal election law, several witnesses proposed that, in the new law, ballot receipt deadlines be extended for overseas voters until after election day. *See, e.g.*, *Overseas Absentee Voting: Hearing on The Overseas Citizens Voting Rights Act of 1975, The Federal Voting Assistance Act of 1955 & S. 703 Before the S. Comm. on Rules & Admin.*, 95th Cong. 17 (1977) (statement of John C. Broger, Deputy Coordinator, Federal Voting Assistance Program) (suggesting a deadline of ten days after election day); *id.* at 67 (statement of William G. Whyte, Chairman of the Public Affairs Committee of the Chamber of Commerce of the United States) (suggesting 20 days); *id.* at 74 (statement of Steven Cohen, Former Campaign Director of Democrats Abroad, Democratic National Committee) (suggesting ten days). Part of the congressional record also showed that, at the time, two states counted overseas ballots that arrived after election day. *Id.* at 33-34 (listing Nebraska and

Washington). Nevertheless, Congress did not enact any federal ballot-receipt deadline, leaving states the flexibility to enact such provisions.

Then, when passing the Uniformed and Overseas Citizens Absentee Voting Act, Congress once again left state systems in place. The new law required states to allow "absent uniformed services voters and overseas voters . . . to vote by absentee ballot in general, special, primary, and runoff elections for Federal office." 52 U.S.C. § 20302(a)(1). Notably, however, the Act does not set a receipt deadline for those ballots, instead instructing the appropriate agency only to "implement procedures that facilitate the delivery of marked absentee ballots . . . not later than the date by which an absentee ballot must be received in order to be counted in the election." *Id.* § 20304(b)(1).

And most recently, in 2022, Congress amended 3 U.S.C. § 1 to use the word "election day," which it then defined. 3 U.S.C. §§ 1, 21(1). Again, Congress was surely aware that the majority of states at the time counted mail-in votes that were cast on or before, but received after, election day. Yet it remained silent on ballot-receipt deadlines. In short, with Congress aware that at least some states were counting some ballots that arrived after election day, repeated congressional inaction suggests, at most, congressional approval of the status quo. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989) ("The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the

operation of state law in a field of federal interest, and has nonetheless decided to 'stand by both concepts and to tolerate whatever tension there [is] between them.'" (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256 (1984))); *cf. Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001) ("What persuades us . . . is the long history of congressional tolerance, despite the federal election day statute, of absentee balloting and express congressional approval of absentee balloting when it has spoken on the issue.").

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General
District of Columbia

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

MARK A. RUCCI
Assistant Attorney General

Office of the Attorney General for
 the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

February 2025

23

On behalf of:

ROB BONTA
*Attorney General*
*State of California*
1515 Clay Street
Oakland, CA 94612

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19081

ANNE E. LOPEZ
*Attorney General*
*State of Hawaii*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 S. LaSalle Street
Chicago, IL 60603

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5). This brief contains 5,556 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f). I also certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on February 27, 2025, an electronic copy of the foregoing brief was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE