No. 24-5071

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

REPUBLICAN NATIONAL COMMITTEE, et al.,

*Plaintiffs-Appellants*,

v.

CARI-ANN BURGESS, in her official capacity as the Washoe County Registrar of Voters, et al.,

*Defendants-Appellees,*

VET VOICE FOUNDATION, et al.,

*Intervenor-Defendants–Appellees.*

On Appeal from the United States District Court
for the District of Nevada, Case No. 3:24-CV-00198
Hon. Miranda M. Du

APPELLANTS' REPLY BRIEF

Jeffrey F. Barr
ASHCRAFT & BARR LLP
8275 South Eastern Ave., Ste. 200
Las Vegas, NV 89123
(702) 631-4755
barrj@ashcraftbarr.com

Michael A. Columbo
DHILLON LAW GROUP, INC.
177 Post St., Ste. 700
San Francisco, California 94108
MColumbo@dhillonlaw.com

Thomas R. McCarthy
Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Table of Authorities .................................................................................................... ii

Introduction ............................................................................................................... 1

Argument ................................................................................................................... 2

   I.   Plaintiffs pled multiple injuries-in-fact. ........................................................ 2

       A.  Plaintiffs pled plausible injuries to their electoral prospects. ........................ 3

           1.  Being forced to adjust campaign plans is a cognizable competitive injury. ................................................................................................. 3

           2.  Nevada's extended deadline arguably promotes Democrats' electoral prospects. ...................................................................................... 7

       B.  Plaintiffs plausibly pled injury to their core political activities. ................. 11

   II.  Plaintiffs plausibly alleged associational standing. .................................... 16

   III.  The district court disputed Plaintiffs' factual claims and failed to give Plaintiffs an opportunity to amend their Complaint. ............................... 18

   IV.  Plaintiffs are not precluded by a different case involving a different law, different facts, and different bases for standing. ..................................... 20

   V.  Defendants' merits arguments are premature and split with the Fifth Circuit. ................................................................................................. 22

Conclusion .............................................................................................................. 27

Certificate of Compliance ...................................................................................... 29

Certificate of Service .............................................................................................. 29

Certificate of Paper Copies .................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Am. President Lines v. Int'l Longshore & Warehouse Union*,
721 F.3d 1147 (9th Cir. 2013) ........................................................22

*Ariz. All. for Retired Ams. v. Mayes*,
117 F.4th 1165 (9th Cir. 2024) ......................................................... 1

*Ariz. All. for Retired Ams. v. Mayes*,
130 F.4th 1177 (9th Cir. 2025) ....................................................1, 11

*Arizona v. Inter-Tribal Council of Ariz.*,
570 U.S. 1 (2013) ...........................................................................24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................... 8, 9, 10

*Baker v. Carr*,
369 U.S. 186 (1962) ........................................................................10

*Bingaman v. Dep't of Treasury*,
127 F.3d 1431 (Fed. Cir. 1997) ......................................................21

*Bognet v. Degraffenreid*,
141 S. Ct. 2508 (2021) ....................................................................23

*Bognet v. Sec'y of Pa.*,
980 F.3d 336 (3d Cir. 2020) ...........................................................23

*Bost v. Ill. State Bd. of Elections*,
114 F.4th 634 (7th Cir. 2024) ................................................... 16, 17

*Bost v. Ill. State Bd. of Elections*,
684 F. Supp. 3d 720 (N.D. Ill. 2023) ..............................................23

*Carson v. Simon*,
978 F.3d 1051 (8th Cir. 2020) ................................................... 16, 17

*Castro v. Scanlan*,
86 F.4th 947 (1st Cir. 2023) .............................................................. 4

*City of Los Angeles v. Barr*,
929 F.3d 1163 (9th Cir. 2019) ........................................................... 5

*Comm'r v. Sunnen*,
333 U.S. 591 (1948) .................................................................. 20, 21

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................................................10

*Disabled Am. Veterans v. Comm'r*,
942 F.2d 309 (6th Cir. 1991) ...................................................................21

*DNC v. Wis. State Legislature*,
141 S. Ct. 28 (2020) .................................................................................24

*Dodd v. Hood River Cnty.*,
59 F.3d 852 (9th Cir. 1995) ................................................................22, 23

*Donald J. Trump for President v. Cegavske*,
488 F. Supp. 3d 993 (D. Nev. 2020) ................................................20, 21

*Donald J. Trump for President v. Way*,
492 F. Supp. 3d 354 (D.N.J. 2020) ........................................................23

*Eureka Fed. Sav. & Loan Ass'n v. Am. Casualty Co. of Reading*,
873 F.2d 229 (9th Cir. 1989) .................................................................22

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ..........................................................................passim

*Fortyune v. Am. Multi-Cinema, Inc.*,
364 F.3d 1075 (9th Cir. 2004) ..................................................................6

*Foster v. Love*,
522 U.S. 67 (1997) ......................................................................24, 25, 27

*Friends of the Earth v. Sanderson Farms*,
992 F.3d 939 (9th Cir. 2021) .................................................................18

*Hampton v. Pac. Inv. Mgmt.*,
869 F.3d 844 (9th Cir. 2017) ...........................................................19, 23

*Harris v. Fla. Elections Canvassing Comm'n*,
122 F. Supp. 2d 1317 (N.D. Fla. 2000) ...............................................23

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ...........................................................2, 11, 14, 19

*Inv. Co. v. Camp*,
401 U.S. 617 (1971) ..................................................................................5

*Janjua v. Neufeld*,
933 F.3d 1061 (9th Cir. 2019) ..............................................................22

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
624 F.3d 1083 (9th Cir. 2010) ..............................................................15

*La. Energy & Power Auth. v. FERC*,
141 F.3d 364 (D.C. Cir. 1998) ...............................................................4

*Lance v. Coffman*,
549 U.S. 437 (2007) ........................................................................17

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) ......................................................17

*Love v. Foster*,
90 F.3d 1026 (5th Cir. 1996) ........................................................27

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................................................................9, 17

*McConnell v. FEC*,
540 U.S. 93 (2003) ...........................................................................7

*Mecinas v. Hobbs*,
30 F.4th 890 (9th Cir. 2022) .............................................3, 4, 8, 9

*Missouri ex rel. Koster v. Harris*,
847 F.3d 646 (9th Cir. 2017) ........................................................19

*Murthy v. Missouri*,
603 U.S. 43 (2024) ............................................................................6

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ............................................................................27

*Owen v. Mulligan*,
640 F.2d 1130 (9th Cir. 1981) ...............................................3, 7, 8

*Pa. Democratic Party v. Boockvar*,
238 A.3d 345 (Pa. 2020) ...............................................................23

*Panhandle Producers & Royalty Owners Ass'n v. ERA*,
822 F.2d 1105 (D.C. Cir. 1987) .....................................................5

*Planned Parenthood of Greater Wash. & N. Idaho v. HHS*,
946 F.3d 1100 (9th Cir. 2020) .................................................4, 5, 6

*Rick-Mik Enters. v. Equilon Enters.*,
532 F.3d 963 (9th Cir. 2008) ........................................................19

*RNC v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024) ...............................................1, 3, 15

*RNC v. Wetzel*,
120 F.4th 200 (5th Cir. 2024) ................................................passim

*RNC v. Wetzel*,
742 F. Supp. 3d 587 (S.D. Miss. 2024) ........................1, 12, 13, 14

iv

*Schlesinger v. Reservists Comm. to Stop the War*,
  418 U.S. 208 (1974) ................................................................... 17

*Shays v. FEC*,
  414 F.3d 76 (D.C. Cir. 2005) ........................................... passim

*Singleton v. Wulff*,
  428 U.S. 106 (1976) ...................................................... 2, 20, 22

*Spurlock v. FBI*,
  69 F.3d 1010 (9th Cir. 1995) ................................................. 23

*State v. Su*,
  121 F.4th 1 (9th Cir. 2024) ................................................... 11

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ................................................................. 15

*Steen v. John Hancock Mut. Life Ins.*,
  106 F.3d 904 (9th Cir. 1997) ................................................. 21

*Trump v. Wis. Elections Comm'n*,
  983 F.3d 919 (7th Cir. 2020) ........................................... 16, 17

*United States v. Corinthian Colleges*,
  655 F.3d 984 (9th Cir. 2011) ................................................. 19

*United States v. SCRAP*,
  412 U.S. 669 (1973) .............................................................. 10

*Voting Integrity Project v. Keisling*,
  259 F.3d 1169 (9th Cir. 2001) ......................................... 24, 26

*Warth v. Seldin*,
  422 U.S. 490 (1975) ......................................................... 11, 18

*Wood v. Raffensperger*,
  981 F.3d 1307 (11th Cir. 2020) ............................................ 16

*Zimmerman v. City of Austin*,
  881 F.3d 378 (5th Cir. 2018) ................................................... 3

## Statutes

1866 Nev. Stat. 210 ................................................................... 26

Act of August 3, 2020, 2020 Nev. Laws Ch. 3 (A.B. 4) ................. 20

Act of June 2, 2021, 2021 Nev. Laws Ch. 248 (A.B. 321) .............. 20

Miss. Code §23-15-637 ............................................................... 16

N.R.S. §293.269921 .......................................................................... passim

N.R.S. §293.423 ....................................................................................... 25

## INTRODUCTION

Following *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), the Fourth and Fifth Circuits held that the RNC has standing to challenge a State's failure to comply with federal election laws based on perceptible harm to the RNC's mission. *See RNC v. N.C. State Bd. of Elections*, 120 F.4th 390, 399 (4th Cir. 2024); *RNC v. Wetzel*, 120 F.4th 200, 205 & n.3 (5th Cir. 2024). The State's brief doesn't mention either case. Instead, the State relies on the now-vacated opinion in *Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024). But *Mayes* is no longer the law of this Circuit. 130 F.4th 1177 (9th Cir. 2025).

The DNC and Vet Voice Foundation at least confront the out-of-circuit precedents. After all, both participated in *RNC v. Wetzel* when the district court ruled on summary-judgment that Mississippi's similar mail-ballot receipt deadline causes the RNC "concrete" organizational injury. 742 F. Supp. 3d 587, 590 & n.2, 595 (S.D. Miss.), *rev'd on other grounds*, 120 F.4th 200. On appeal, neither the DNC nor Vet Voice contested that summary-judgment ruling. *Wetzel*, 120 F.4th at 205 & n.3. But in this Court, the DNC and Vet Voice contest at the pleading stage the RNC's same injuries supporting substantively identical claims.

While Defendants pay lip service to the district court's standing ruling, they devote much of their briefing to the merits. But the district court "denied" the 12(b)(6) motions "as moot" because it concluded that it "lacks subject-matter jurisdiction to resolve them." ER-17. This Court generally "does not consider an issue not passed

upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). The Court should thus reverse the district court's standing ruling and remand for the district court to address the merits.

## ARGUMENT

Defendants' arguments should be rejected for five reasons. First, Plaintiffs plausibly allege direct organizational standing. Second, Plaintiffs plausibly allege associational standing. Third, the district court erred by demanding evidence at the pleading stage. Fourth, issue preclusion doesn't bar Plaintiffs' suit. Fifth, Defendants' merits arguments are premature.

### I. Plaintiffs pled multiple injuries-in-fact.

Defendants can't agree among themselves what qualifies as an injury-in-fact. The State and Vet Voice argue that to allege competitive injury, Plaintiffs must show that a "different election result" will occur. VV Br. 20-21; NV Br. 22. The DNC, however, acknowledges that "a political party" need not "show" that a challenged election law will "change" the "actual outcome of a partisan election" for competitive standing. DNC Br. 18 (cleaned up). And while the State and Vet Voice argue that Plaintiffs didn't plead standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the DNC's brief is silent about Plaintiffs' organizational standing. NV Br. 32; VV Br. 20-21.

Under the correct standard, Plaintiffs pled organizational injury. Political organizations have standing when they allege that "abuses of mail preferences" might "'arguably promote'" their opponents' "'electoral prospects.'" *Owen v. Mulligan*, 640 F.2d

1130, 1133 (9th Cir. 1981). And they have standing when they allege that a State's failure to abide by federal election laws has "'affected and interfered with'" their core activities. *RNC*, 120 F.4th at 397.

## A. Plaintiffs pled plausible injuries to their electoral prospects.

Defendants reject Plaintiffs' competitive standing by misconstruing Plaintiffs' injuries and asking the Court to "narrow[] competitive standing as a basis for injury in fact." *Mecinas v. Hobbs*, 30 F.4th 890, 899 (9th Cir. 2022). Plaintiffs don't rely on the "bare assertion of an illegally structured competitive environment" or mere "unlawfulness itself." *Contra* NV Br. 30; DNC Br. 9. They allege that the extended deadline requires Plaintiffs to "adjust their campaign strategy" and to "anticipate and respond to a broader range of competitive tactics than federal law would otherwise allow." *Shays v. FEC*, 414 F.3d 76, 86-87 (D.C. Cir. 2005). The extended deadline "makes the competitive landscape worse" for Republicans. *Mecinas*, 30 F.4th at 898. And it "'arguably promote[s]'" Democrats' "'electoral prospects'" by extending the deadline for mail voting, a type of voting Democrats widely use. *Owen*, 640 F.2d at 1133.

### 1. Being forced to adjust campaign plans is a cognizable competitive injury.

"[C]hanging one's campaign plans or strategies in response to an allegedly injurious law can itself be a sufficient injury to confer standing." *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018). The D.C. Circuit held as much in *Shays*, 414

F.3d at 87, and this Court has found *Shays* to be persuasive precedent, *Mecinas*, 30 F.4th at 898.

The State argues that there are only "two means" to assert competitive standing, and changing campaign plans isn't one. NV Br. 17. The *Shays* dissent made the same argument. 414 F.3d at 122 (Henderson, J., dissenting). But it's the *Shays* majority opinion that this Court has approvingly cited. *Mecinas*, 30 F.4th at 898. The *Shays* majority held that competitive standing can be demonstrated in a third way: Plaintiffs can allege "competition intensified" due to "practices" that are "banned" by federal law and that they accordingly "need to adjust their campaign strategy." 414 F.3d at 87.

The State argues Plaintiffs are "selective[ly] quoting" *Shays* and must allege that "chasing mail ballots" would "cause them to violate" federal law. NV Br. 29. But *Shays'* holding doesn't require that allegation: "when regulations illegally structure a competitive environment," then "parties defending concrete interests (e.g., retention of elected office) in that environment suffer legal harm." 414 F.3d at 87. Plaintiffs need not allege that they are forced to violate federal law. *Id.* at 89. Rather, Plaintiffs need only allege that they are "'harmed by having to anticipate other actors taking advantage'" of an activity that "'otherwise would be barred'" by federal law. *Id.* at 87.

This competitive injury rests on "'[b]asic economic logic.'" *Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100, 1109 (9th Cir. 2020). "[O]ne direct competitor's gain of market share is another's loss." *Castro v. Scanlan*, 86 F.4th 947, 954 (1st Cir. 2023); *see also La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir.

1998) (parties suffer injury "when agencies lift regulatory restrictions on their competitors."); *Panhandle Producers & Royalty Owners Ass'n v. ERA*, 822 F.2d 1105, 1108 (D.C. Cir. 1987) (gas producers can challenge order authorizing importation of gas from Canada, since that gas would compete with theirs); *Inv. Co. v. Camp*, 401 U.S. 617, 620-21 (1971) (mutual fund management companies can challenge regulation authorizing banks to manage mutual funds). When an agency takes "statutorily impermissible" action when regulating a grant competition, for example, Article III standing exists for a competing party to sue to ensure a "lawful" competition. *Planned Parenthood*, 946 F.3d at 1109. The party need "not argue it was prevented by law" from acting. *City of Los Angeles v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019). Even when a plaintiff's "slight competitive disadvantage" is due to its own "policy," that injury is still "sufficient." *Id.* at 1174. Whether the competition concerns dollars or votes, "[t]he need for an ample competitor standing doctrine" is "obvious." *Planned Parenthood*, 946 F.3d at 1109. If Plaintiffs don't have standing, then Nevada's law will be "insulated from judicial review" and the "effects" will "echo through many corridors of the law." *Id.*

A faithful application of the competitor standing doctrine dispenses with Defendants' arguments. Defendants argue, as the *Shays* dissent did, that Plaintiffs' injury is not actual or imminent. *Compare* NV Br. 31 ("[m]ere speculation" about "future harm does not support standing" (cleaned up)), *with Shays*, 414 F.3d at 116 (Shays "speculate[s]" he "*may* suffer vaguely described injuries at some future time"). Vet Voice argues that Plaintiffs "cannot allege how voters will vote in future elections." VV Br.

18. But Vet Voice at least admits "the past is relevant" insofar as "it is a launching pad for a showing of imminent future injury." *Id.* (quoting *Murthy v. Missouri*, 603 U.S. 43, 59 (2024)). Plaintiffs allege that in past Nevada elections "[m]ail ballots from Democratic voters" do "tend to arrive late." ER-31. Indeed, for that very reason the DNC argued that granting Plaintiffs relief "directly threatens the DNC's interests." FER-15. Nevada's law allowing late votes governs future elections. N.R.S. §293.269921. So Nevada's "ongoing policy coupled with [Plaintiffs'] past injury" establishes imminence. *Cf. Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004).

Moreover, when "adverse use of illegally granted opportunities appears inevitable, affected parties may challenge the government's authorization of those opportunities without waiting for specific competitors to seize them." *Shays*, 414 F.3d at 90; *see Planned Parenthood*, 946 F.3d at 1108 (Plaintiffs "need not participate in the competition."). The DNC acknowledges that it exploits Nevada's extended mail-ballot receipt deadline to chase additional votes. FER-14-16. So the extended deadline "'almost surely cause[s]'" Plaintiffs "harm" due to their competitors chasing down votes. *Shays*, 414 F.3d at 90-91. Plaintiffs "must therefore account for use" of the extended deadline "in their own campaign strategy." *Id.*

Defendants channel the *Shays* dissent to argue that Plaintiffs' competitive injury isn't particularized. *Compare* NV Br. 31 ("any need to respond to changes is generalized amongst all the candidates"), *with Shays*, 414 F.3d at 122 ("if the FEC altered the competitive environment's overall rules, it did so for *all* candidates" (cleaned up)). But

6

that argument misapprehends the injury. Plaintiffs' injury is the need to "account for" intensified competition due to Nevada's extended deadline in "*their own* campaign strategy." *Shays*, 414 F.3d at 90-91 (emphasis added). That's not an injury shared "amongst all the candidates." *Contra* NV Br. 31. Unlike the DNC, Plaintiffs' campaign strategy is "to elect Republican[s]." ER-22.

Defendants' causation analysis also relies on the *Shays* dissent. Defendants argue that Plaintiffs' competitive injury is a "personal choice." *Compare* NV Br. 30 (quoting *McConnell v. FEC*, 540 U.S. 93, 228 (2003)), *with Shays*, 414 F.3d at 121 (quoting same language from *McConnell*). In the State's view, "the opportunity to pursue ballots" under Nevada's post-election-day deadline "is equally open to both Plaintiffs and their opponents." NV Br. 18. But the *Shays* majority rejected that flawed reasoning. The injury is "being put to the choice" of either changing campaign plans or "suffering disadvantage." *Shays*, 414 F.3d at 89. Given that the federal election-day statutes' "prohibitions" would "apply absent" Nevada's extended deadline, Plaintiffs' "asserted injury—having to defend their office in illegally constituted reelection fights—is not a matter of 'their personal choice,' as it was in *McConnell*." *Id.* Rather, "it stems from the operation" of Nevada's "regulations permitting what [federal law] bans." *Id.*

### 2. Nevada's extended deadline arguably promotes Democrats' electoral prospects.

Plaintiffs allege that Democrats' "'electoral prospects'" are "'arguably promote[d]'" by Nevada's post-election-day deadline. *Owen*, 640 F.2d at 1133.

Defendants conjure up alternative theories about why the RNC might not suffer electoral harms from Democrats' late mail-voting habits. They speculate that independent voters might vote for Republican candidates in greater numbers, or that the electoral numbers could be different in future elections, or that Democrats would start voting earlier if the law is changed. But the pleading standard doesn't permit the Court to speculate about some state of future facts where Plaintiffs aren't harmed. Rather, Plaintiffs must only "plead[] factual content that allows the court to draw the reasonable inference" that they have been harmed. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The State and Vet Voice err by arguing Plaintiffs must plead that an outcome-determinative number of votes are at stake. NV Br. 22; VV Br. 20. The DNC rejects that argument, noting that under this Court's precedents competitive standing is triggered when any number of votes is at stake. DNC Br. 17-18 (citing *Mecinas*, 30 F.4th at 897). Plaintiffs must only allege that the "abuses" they seek to remedy "'arguably promote'" their opponents' "'electoral prospects.'" *Owen*, 640 F.2d at 1133.

Plaintiffs also need not allege "unique harms." *Contra* NV Br. 18. This Court has recognized the Democratic Party's standing to challenge a neutral, generally applicable ballot-order statute that didn't facially advantage either party. *Mecinas*, 30 F.4th at 895. The statute established that "candidates of the political party that received the most votes in the most recent gubernatorial election" appear "first" on "all ballots." *Id.* The DNC established competitive standing by "explaining that the Ballot Order Statute

8

'frustrat[es] its mission'" to "'elect Democratic Party candidates' by allegedly diverting more votes to Republicans." *Id.* at 897. Plaintiffs have alleged virtually identical harms here. ER-29-32.

Vet Voice points out that the *Mecinas* plaintiffs provided expert testimony that if "Democratic candidates were more frequently listed first, they would benefit from that." VV Br. 20. But that was because the Democratic Party moved for a preliminary injunction. *Mecinas*, 30 F.4th at 896 & n.2. Here, at the pleading stage, Plaintiffs need not produce expert testimony. Factual allegations "suffice." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs allege enough factual content to make it plausible that Nevada's post-election-day deadline favors their chief competitors. The State argues that "[t]here is nothing suggesting that Democratic voters vote more *by mail*." NV Br. 20. But according to the State's own statistics, "60.3% of Democratic voters voted by mail" in Nevada, "compared to just 36.9% of Republican voters" in 2020 and "61.3% of Democrats and just 40% of Republicans voted by mail" in 2022. ER-31. Even the district court acknowledged that "Democrats in Nevada have returned more mail ballots than Republicans in the past two general elections." ER-7 n.4. These voter-turnout statistics support a reasonable inference that Democrats benefit from Nevada's late mail-ballot deadline.

The State speculates that Democrats might return mail-ballots by drop box or in-person delivery at higher rates than Republicans. NV Br. 20. The State offers no

reason to assume that's true. And those are precisely the "reasonable inference[s]" that must be drawn in Plaintiffs' favor. *Iqbal*, 556 U.S. at 678. Even if the State supported its data critiques, it wouldn't be enough for dismissal. Plaintiffs need only allege that "a fraction of a vote" will break for Democrats, since "'an identifiable trifle is enough for standing.'" *United States v. SCRAP*, 412 U.S. 669, 689 n.14 (1973) (citing *Baker v. Carr*, 369 U.S. 186 (1962)). That Nevada Democrats have in the past two general elections voted by mail at nearly twice the rate of Republicans raises a "reasonable inference" of partisan advantage. *Iqbal*, 556 U.S. at 678. Finally, the State disputes the credibility of Plaintiffs' allegations that Democratic ballots arrive late. NV Br. 20-21. But at this stage, those allegations must be "accepted as true." *Iqbal*, 556 U.S. at 678.

The DNC argues that mail voting doesn't help Democrats and "an electoral disadvantage cannot be plausibly assumed." DNC Br. 17. But in their motion to intervene, the DNC argued that "[i]f Plaintiffs succeed in enjoining NRS 293.269921," then it will "undoubtedly" affect "both the DNC's voter-members' ability to vote and candidate members' ability to win." FER-14. That the DNC agrees that putting a stop to post-election ballot receipt would harm its electoral prospects means that continuing the practice harms Plaintiffs' competitive interests.

Defendants speculate that future elections might be different because voters' behavior is "not sufficiently predictable." NV Br. 24 (cleaned up). But by producing two election cycles' worth of data, Plaintiffs "have met their burden of showing" that Democratic voters "will likely react in predictable ways" based on how they "have

historically" voted. *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Because Article III "requires no more than *de facto* causality, traceability is satisfied here." *Id.* (cleaned up).

### B.    Plaintiffs plausibly pled injury to their core political activities.

Organizational standing is established when a defendant's act "perceptibly impair[s]" the "organization's activities" as shown by a "consequent drain" in resources. *Havens*, 455 U.S. at 379. The DNC doesn't dispute that Plaintiffs have standing under *Havens*. The State and Vet Voice do, but they commit multiple errors.

**First**, the State relies on a vacated panel decision in *Arizona Alliance for Retired Americans v. Mayes*. The State argues that *Mayes* properly construes this Court's precedents and correctly reads *Havens*. NV Br. 36, 39. But *Mayes* is now vacated. 130 F.4th 1177 (9th Cir. 2025). It is "no longer binding law" and has "no precedential authority." *State v. Su*, 121 F.4th 1, 9 n.2 (9th Cir. 2024) (cleaned up). The State's arguments relying on *Mayes* must be rejected.

**Second**, Defendants refuse to "accept as true" Plaintiffs' plausible jurisdictional allegations. *Contra Warth v. Seldin*, 422 U.S. 490, 501 (1975). In their view, Nevada's mail-ballot receipt deadline "make[s] it *easier* for Plaintiffs to obtain Republican votes" as it gives Plaintiffs "a longer period of time." NV Br. 34. But even the district court disagreed with that assumption. The district court acknowledged that Nevada's mail-ballot receipt deadline "might," "could," and "may" require Plaintiffs to "devote more resources to poll watching and election-integrity trainings," "hire poll watchers for more

total hours than they otherwise would have," and divert "resources" that "could be put toward campaigning" to "time-consuming and expensive" post-election-day activities. ER-12. Post-election-day receipt of mail-ballots "frustrates and impedes the Republican Party's mission of represent[ing]" Republican "interests" and "secur[ing] the election of Republican candidates." *Wetzel*, 742 F. Supp. 3d at 594 (cleaned up). That's not just an allegation the RNC plausibly pled here; it's a fact the RNC already proved on summary judgment in another case. *Id.* at 594-96.

**Third**, Defendants mistakenly argue that Plaintiffs must plead injuries to new activities. In their view, with or without Nevada's extended deadline, Plaintiffs will "[e]ngag[e] in the same mail ballot collection push." NV Br. 34 (cleaned up). They maintain that Plaintiffs allege only "a continuation" of "existing" activities, *id.*, nothing more than the "evergreen costs of campaigning," VV Br. 23. But "perform[ing] more extensive and expensive ballot-chasing and poll-watching efforts necessitated by the acceptance of absentee ballots received after election day" are not "routine activities," but rather unwanted "diversion[s]." *Wetzel*, 742 F. Supp. 3d at 594-95. "[C]hasing" mail ballots "requires establishing and executing a separate, parallel get-out-the-vote effort supported by training, voter education, and voter outreach." *Id.* (cleaned up). "Counting ballots received after Election Day thus requires Plaintiffs and their members to divert more time and money to post-election mail ballot activities." ER-29.

Defendants' reasoning flips *Havens* on its head. "*Havens*" requires alleging injury to an organization's "core" activities, not new activities. *All. for Hippocratic Med.*, 602

U.S. at 395. Injury to new activities is the sort of allegation the Supreme Court has cautioned against because "[a]n organization cannot manufacture its own standing." *Id.* at 394. By requiring Plaintiffs to plead injuries to activities they don't normally engage in, Defendants advocate what *Hippocratic Medicine* rebuked.

**Fourth**, Defendants strawman Plaintiffs' injuries by reducing them to just spending money. They assert that Plaintiffs are attempting to "spend their way into standing." NV Br. 35, 39; VV Br. 24. But that claim misunderstands the injury. Plaintiffs' injury is being forced to alter their core political activities—not merely diverting resources. ER-29. Post-election receipt of mail ballots requires the RNC "to perform more extensive and expensive ballot-chasing and poll-watching efforts necessitated by the acceptance of absentee ballots received after election day." *Wetzel*, 742 F. Supp. 3d at 594. It requires "training of poll watchers, preparation of relevant materials, payment to attorneys for review, and securing additional volunteer time." *Id.* (cleaned up). Because not doing those things risks losing the election and harming Plaintiffs' mission, those are "concrete" injuries. *Id.* at 595.

That Plaintiffs divert resources to counteract these injuries just confirms that Nevada's post-election-day receipt deadline "perceptibly impair[s]" Plaintiffs' core mission. *Havens*, 455 U.S. at 379. Diverting resources alone doesn't establish organizational standing. *All. for Hippocratic Med.*, 602 U.S. at 395. But Plaintiffs don't rely on resource diversion as the injury. Rather, Plaintiffs allege that Defendants' "actions directly affect[] and interfere[]" with their core political activities of electing Republicans

13

by chasing down Republican ballots and ensuring those ballots are properly counted. *Id.* Unlike the doctors in *Hippocratic Medicine*, Plaintiffs don't rely merely on resources spent to avoid injury to others. Instead, they divert resources to counteract injuries to their own "core business activities." *Id.* That makes this case like *Havens*, not *Hippocratic Medicine*.

**Fifth**, Vet Voice suggests that what matters for standing is the date mail ballots are counted rather than received. VV Br. 22. That argument outright contests Plaintiffs' allegation that the receipt deadline requires them to run additional "mail ballot chase programs." ER-22-23. It also misconceives Plaintiffs' injury. Nevada's post-election deadline requires election officials to judge the time of receipt and the date of the postmark. N.R.S. §293.269921. Those realities require Plaintiffs to conduct additional training, preparation, and post-election-day activities, all of which siphon "resources from in-person Election Day get-out-the-vote activities." ER-29.

**Sixth**, Defendants misrepresent Plaintiffs' injuries as "voluntary" choices. VV Br. 23 (cleaned up). The State argues that "Nevada doesn't have a crystal ball to predict that Plaintiffs would shift resources." NV Br. 38. But whether Defendants can predict Plaintiffs' injury is irrelevant to whether Plaintiffs suffer injury. And one doesn't need a crystal ball to see that extending the mail-ballot receipt deadline intensifies the competition for mail ballots, and that to "elect Republican candidates," the RNC and NVGOP must participate in that competition. ER-22. Nevada's law puts Plaintiffs in a Catch-22: forego the intensified competition for mail ballots or spend resources "in

order to perform more extensive and expensive ballot-chasing and poll-watching efforts necessitated" by the post-election-day deadline. *Wetzel*, 742 F. Supp. 3d at 594. Where an organization can't "avoid suffering one injury or the other," under *Havens*, it has "standing to sue." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).

**Seventh**, Defendants fail to distinguish persuasive circuit court decisions recognizing the RNC's standing. *RNC*, 120 F.4th at 397; *Wetzel*, 120 F.4th at 205 & n.3. The State ignores these cases entirely. Vet Voice mentions them briefly. It argues that the Fourth Circuit's ruling doesn't apply because Plaintiffs didn't allege voter fraud here. VV Br. 25. But the Fourth Circuit held that the RNC had standing because the State's failure to comply with federal law required the RNC to expend resources "providing services aimed at promoting Republican voter engagement" and "monitoring various aspects of the upcoming election in North Carolina." *RNC*, 120 F.4th at 396-97. This case isn't materially different. Here, Plaintiffs must expend resources to chase mail ballots and on poll-watching activities to monitor mail-ballot receipt after election day due to Nevada's extended deadline. ER-22-23, 29. This case "involves more than simply an organization's efforts to 'spend its way into standing.'" *RNC*, 120 F.4th at 396.

The Fifth Circuit's decision is also persuasive. Vet Voice argues it's just a "drive-by" ruling. VV Br. 25-26 (cleaned up). But "drive-by" standing rulings are when a court "assume[s]" standing "without discussion." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998). In *Wetzel*, the Fifth Circuit discussed the RNC's standing to challenge

15

Mississippi's law permitting mail-ballot receipt after the election. 120 F.4th at 205 & n.3. The discussion was brief because the "case fits comfortably within [the court's] precedents." *Id.* (collecting cases). There's nothing "distinct" about Mississippi's law. *Contra* VV Br. 26. Both Nevada and Mississippi require mail-ballots to be "postmarked on or before the date of the election." N.R.S. §293.269921(1)(b)(1); Miss. Code §23-15-637(1)(a).

The Fifth Circuit's recognition of the RNC's standing to challenge Mississippi's deadline is directly on point. That the panel affirmed the district court's *summary judgment* ruling should remove all doubt that Plaintiffs have standing at the *pleading* stage. And to the extent the Supreme Court signaled "a major change in the law of direct organizational standing," NV Br. 15 n.10, both the Fourth and Fifth Circuits held that the RNC has standing after *Hippocratic Medicine*. This Court should do the same.

## II. Plaintiffs plausibly alleged associational standing.

Defendants argue that Plaintiffs lack associational standing only by contesting the persuasive authority of the Eighth Circuit's decision in *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020). Defendants argue that *Carson* recognizes an impermissibly generalized injury. NV Br. 40. But it's well established that candidates have standing to challenge inaccurate vote tallies. *See, e.g.*, *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) ("political candidate" suffers "distinct injury" when unlawful ballots are counted). Candidates contesting election law violations can answer standing's core

16

question—"What's it to you?"—in a "personal and individual way." *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924 (7th Cir. 2020) (cleaned up).

The State cites *Bost v. Illinois State Board of Elections*, 114 F.4th 634 (7th Cir. 2024), to argue that *Carson* has been "question[ed]." NV Br. 40. But *Bost* distinguished *Carson* on factual grounds. *Bost*, 114 F.4th at 643-44. The Seventh Circuit "question[ed]" *Carson*, *id.*, but it didn't split from the Eighth Circuit. Indeed, the Seventh Circuit has affirmed *Carson*, recognizing that "'[a]n inaccurate vote tally is a concrete and particularized injury to candidates.'" *Trump*, 983 F.3d at 924 (quoting *Carson*).

A candidate's interest in an accurate vote tally is not a generalized grievance. The State cites *Lance v. Coffman*, 549 U.S. 437 (2007) to argue otherwise. NV Br. 40. But *Lance* was about *voters'* standing. 549 U.S. at 441. It said nothing about candidates, who could win or lose an election "stemming from the allegedly unlawful manner" an election is conducted. *Trump*, 983 F.3d at 924. An injury is too "generalized" if the party is "claiming only harm to his and every citizen's interest in proper application of the Constitution and laws." *Lujan*, 504 U.S. at 573-74. But the injury suffered by candidates for office isn't something "all citizens share." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220 (1974). It's something only candidates experience. Since *Carson* is correct and Plaintiffs' candidate members suffer particularized injury due to Nevada's inaccurate vote tally, Plaintiffs have associational standing.

### III. The district court disputed Plaintiffs' factual claims and failed to give Plaintiffs an opportunity to amend their Complaint.

Defendants' arguments don't justify the district court applying an improper evidentiary standard to Plaintiffs' jurisdictional allegations. The district court transformed Defendants' motions to dismiss from "facial" into "factual attack[s]" on Plaintiffs' "jurisdictional allegations." *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014). The State and DNC don't defend this error. Vet Voice admits the district court was "imprecise" in using the word "evidence" to describe Plaintiffs' burden at the pleading stage. VV Br. 30. Vet Voice also admits the district court "cited *Friends of the Earth*" as "support for its holding." *Id.* That case involved a factual—not facial— challenge. *Advocacy Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942-44 (9th Cir. 2021).

Despite that error, Vet Voice maintains that the district court "consistently credited Plaintiffs' concrete factual allegations." VV Br. 30. The court's opinion proves otherwise. The court was "not fully convinced" that Plaintiffs have "imminent plans" to hold "trainings and hire poll workers." ER-12 n.7. It questioned the credibility of an article Plaintiffs cited in support of their competitive injury allegations and wanted "more specific information." ER-7 n.4. And it assumed it knew what "business as usual" is for Plaintiffs better than Plaintiffs know their own business. ER-11 (cleaned up). To borrow Vet Voice's phrase, the district court approached Plaintiffs' allegations with "skepticism," VV Br. 29, rather than accepting those allegations "as true," *Warth*,

422 U.S. at 501. By concluding "the record is devoid of evidence" before discovery could even begin, ER-11, the district court erred.

Even if the district court had properly dismissed the case, it should have given Plaintiffs opportunity to amend. It concluded that Plaintiffs' competitive standing "cannot be remedied by additional factual allegations." ER-12 n.7. But even the State suggests that "[i]n theory," Plaintiffs "could allege" specific "facts that might support" at least competitive standing. *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017); *see* NV Br. 19-25. And the district court itself acknowledged that Plaintiffs could likely demonstrate *Havens'* standing theory by pleading allegations that Nevada's deadline "harms the integrity of the mail ballot counting process, such as by increasing the risk of error or fraud." ER-13. Amendment would have been fruitful if the district court hadn't "close[d]" the case. ER-17.

Plaintiffs haven't waived any right to amend. *Contra* VV Br. 49. The district court expressly contemplated whether amendment was appropriate concerning Plaintiffs' competitive standing allegations. ER-12 n.7. The court concluded that Plaintiffs' "underlying argument" concerning competitive standing is "not meritorious and cannot be remedied by additional factual allegations." *Id.* Vet Voice cites *Rick-Mik Enterprises v. Equilon Enterprises*, 532 F.3d 963 (9th Cir. 2008). VV Br. 49. But the appellant in *Rick-Mik* "did not mention leave-to-amend in its opening brief on appeal." 532 F.3d at 976. Here, Plaintiffs raised this issue in their opening brief. Blue Br. 47. They have not

forfeited the argument. *See United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011).

At a minimum, this Court should remand with instructions to enter dismissal without prejudice. Dismissals for lack of subject-matter jurisdiction "must be without prejudice, because a lack of jurisdiction deprives the dismissing court of any power to adjudicate the merits." *Hampton v. Pac. Inv. Mgmt.*, 869 F.3d 844, 846 (9th Cir. 2017).

### IV. Plaintiffs are not precluded by a different case involving a different law, different facts, and different bases for standing.

The State argues that the courthouse doors are forever barred to Plaintiffs because five years ago the RNC and NVGOP brought a different case concerning a different ballot-receipt law that was dismissed on standing. NV Br. 13-14 (citing *Donald J. Trump for President v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020)). The State made this argument below, and the district court didn't address it. *See* ER-17. That the issue was "not passed upon below" is reason enough for this Court not to consider the State's argument. *Singleton*, 428 U.S. at 120. And the district court didn't address the issue for good reason: "the matter[s] raised" in this "second suit" are not "identical in all respects" to *Cegavske. Comm'r v. Sunnen*, 333 U.S. 591, 599-600 (1948).

The issues are different. The law Plaintiffs challenge here was enacted in 2021. ER-21 (citing Act of June 2, 2021, 2021 Nev. Laws Ch. 248, §56 (A.B. 321)). The law challenged in *Cegavske* was enacted in 2020. 488 F. Supp. 3d at 996 (citing Act of August

3, 2020, 2020 Nev. Laws Ch. 3, §20 (A.B. 4)). Plaintiffs' standing to challenge a law enacted in 2021 couldn't have been raised in a case decided in 2020.

The law's provisions are different. The law challenged in *Cegavske* "codified procedures for elections impacted by emergencies." *Id.* The law Plaintiffs challenge codifies procedures for *every* election. ER-21. The law's deadline is different. *Cegavske* concerned a seven-day deadline. A.B. 4 §20(b)(2). This case concerns a four-day deadline. A.B. 321 §56(b)(2). Where "the pertinent statutory provisions" have changed, issue preclusion is inapplicable. *Comm'r*, 333 U.S. at 601; *see also Bingaman v. Dep't of Treasury*, 127 F.3d 1431, 1438 (Fed. Cir. 1997) ("new legislation" can "justify a later court's refusal to give collateral estoppel effect to an earlier decision."); *Disabled Am. Veterans v. Comm'r*, 942 F.2d 309, 316 (6th Cir. 1991) ("adoption of new statutory provisions" may "allow a party to escape the bar of collateral estoppel"). Even the State admits that the law Plaintiffs challenge here is "slightly different" and the claims Plaintiffs bring are "slightly different." NV Br. 14. Given that the State must show the issue "is identical to an issue litigated in a previous action," those admissions are fatal. *Steen v. John Hancock Mut. Life Ins.*, 106 F.3d 904, 912 (9th Cir. 1997) (citation omitted). Since "slightly different" isn't "identical," issue preclusion doesn't apply.

Plaintiffs' standing allegations are different, too. The district court in *Cegavske* made a "fact-intensive finding" disagreeing with the plaintiffs' "theory of organizational standing" based on "a need to divert resources to counteract voter fraud" and "educating their voters." 488 F. Supp. 3d at 1001-03. Plaintiffs here don't allege that

21

they must divert resources to "combat voter fraud." ER-21. Rather, Plaintiffs allege that they must "divert resources to conduct election activities beyond election day," *id.*, a "theory of organizational standing" the district court in *Cegavske* never considered, 488 F. Supp. 3d at 1001. Under the doctrine of issue preclusion, "parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time." *Comm'r*, 333 U.S. at 598. Since Plaintiffs' jurisdictional allegations raise issues that "could have been raised, but were not" in *Cegavske*, "issue preclusion does not apply." *Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir. 2019). At a minimum, there is substantial "doubt" concerning whether those issues were "actually litigated," *Eureka Fed. Sav. & Loan Ass'n v. Am. Casualty Co. of Reading*, 873 F.2d 229, 233 (9th Cir. 1989).

## V. Defendants' merits arguments are premature and split with the Fifth Circuit.

Defendants urge this Court to address the merits, despite arguing that it lacks jurisdiction to do so. As a "general rule," a "federal appellate court does not consider an issue not passed upon below." *Singleton*, 428 U.S. at 120. Although there are rare exceptions "where the proper resolution is beyond any doubt or where injustice might otherwise result," no party argues that those exceptions apply. *Dodd v. Hood River Cnty.*, 59 F.3d 852, 863 (9th Cir. 1995) (cleaned up). In similar circumstances, this Court has thus "reverse[d] and remand[ed] so that the district court may consider the merits." *Am. President Lines v. Int'l Longshore & Warehouse Union*, 721 F.3d 1147, 1153 (9th Cir. 2013).

The district court didn't address the merits because it believed that it "lack[ed] subject-matter jurisdiction to resolve them." ER-17. This Court thus should not consider the merits, even after reversing the district court's standing dismissal.

The State argues that this Court has discretion to "affirm the district court's decision on any ground supported by the record." NV Br. 10. But the district court's "dismissal was grounded on its own lack of jurisdiction," and Defendants cannot "obtain from [this Court] relief more extensive than it received from the district court." *Dodd*, 59 F.3d at 864. Since a dismissal for lack of subject-matter jurisdiction is "without prejudice," *Hampton*, 869 F.3d at 846, Defendants cannot obtain relief on the merits that would be with prejudice, *Dodd*, 59 F.3d at 864; *see also Spurlock v. FBI*, 69 F.3d 1010, 1018 (9th Cir. 1995). Defendants' merits arguments should thus be considered "in the first instance" by the district court. *Dodd*, 59 F.3d at 864.

In any event, Defendants' merits arguments fail because under "the original public meaning of the Election-Day statutes," States must "receive all ballots by Election Day." *Wetzel*, 120 F.4th at 211-12. The Fifth Circuit rejected the same arguments "defendants, intervenors," and "*amici*" raise here. *Id.* at 212.

The State doesn't reference *Wetzel*. Vet Voice and the DNC argue *Wetzel* is an "outlier." VV Br. 44; DNC Br. 26-27. But it's the only precedential appellate decision to address the merits of Plaintiffs' claims. The cases intervenors rely on were either vacated, didn't address the merits, or decided in an emergency posture. *See, e.g.*, *Bognet v. Sec'y of Pa.*, 980 F.3d 336 (3d Cir. 2020), *vacated*, 141 S. Ct. 2508 (2021); *Bost v. Ill. State*

*Bd. of Elections*, 684 F. Supp. 3d 720, 739 (N.D. Ill. 2023) (decided on standing); *Donald J. Trump for President v. Way*, 492 F. Supp. 3d 354, 359 (D.N.J. 2020) (preliminary injunction motion); *Harris v. Fla. Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1324-25 (N.D. Fla. 2000) (consent decree rejecting the claim that "every vote" must be "counted by election officials by midnight" on election day); *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 352-53, 367 (Pa. 2020) (concerned Pennsylvania constitutional claim); *DNC v. Wis. State Legislature*, 141 S. Ct. 28, 34 (2020) (Kavanaugh, J., concurring) (supporting validity of state-imposed Election Day mail-ballot receipt deadline).

The Fifth Circuit rebutted each of Defendants' arguments. "Text, precedent, and historical practice confirm" that the "'day for the election'" established by Congress "is the day by which ballots must be both *cast* by voters and *received* by state officials." *Wetzel*, 120 F.4th at 203-04.

Start with text and precedent. In 1845, Congress "fix[ed] a 'uniform time' for appointing presidential electors on the Tuesday after the first Monday in November." *Id.* at 204 (cleaned up). In 1872, Congress enacted the same "election day" for congressional elections, rejecting "an amendment to allow multi-day voting." *Voting Integrity Project v. Keisling*, 259 F.3d 1169, 1174 (9th Cir. 2001). When Congress regulates under its "Elections Clause power," NV Br. 3, it "*necessarily* displaces" the "pre-existing legal regime erected by the States." *Arizona v. Inter-Tribal Council of Ariz.*, 570 U.S. 1, 14 (2013). Congress did just that with the election-day statutes, displacing a patchwork of state laws allowing for "multi-day voting" to appoint presidential electors and elect

24

congressional members "during different months." *Keisling*, 259 F.3d at 1172-73. As the State acknowledges, "in setting the day for the election, Congress required a 'final act of selection,' to occur on election day." NV Br. 44 (quoting *Foster v. Love*, 522 U.S. 67, 72 (1997)). Indeed, the word "election" in the federal statutes "means a 'consummation' of the process of selecting an official." *Keisling*, 259 F.3d at 1175 (citing *Foster*, 522 U.S. at 72 n.4). "[T]he election is consummated when the last ballot is received." *Wetzel*, 120 F.4th at 208.

Defendants prefer their own definition of "election," under which "a ballot can be 'cast' before it is received." *Id.* at 207. But it's "obvious" a ballot is "'cast' when the State takes custody of it." *Id.* Otherwise a voter could "cast" her ballot by dropping it in the mail, then later "recall" the ballot. *Id.* at 208. The State argues that recalling a mail ballot would need to be done before election day. NV Br. 54. But not if the date of the postmark of the resubmitted ballot can't be determined. N.R.S. §293.269921(2). Further, Defendants' definition contradicts state law, which requires election officials to count all "votes cast." N.R.S. §293.423. In context, "votes cast" means votes received by election officials. It doesn't include ballots later retrieved or received late. So a ballot cannot be considered "cast" when the voter relinquishes it from her custody. *Contra* NV Br. 54. Defendants' "mailbox-rule theory of finality" doesn't comport with the federal statutes' definition of "election," *Wetzel*, 120 F.4th at 207-08, which "plainly refer[s]" to "a final selection," *Foster*, 522 U.S. at 71. "*Receipt* of the last ballot"

constitutes an election's "consummation," and "it must occur on Election Day." *Wetzel*, 120 F.4th at 209.

History also "confirms" that the term "'election' includes both ballot casting" and "receipt." *Id.* at 209. "[A]t the time" Congress passed the election-day statutes, "voting and ballot receipt necessarily occurred at the same time." *Id.* As the DNC admits, no State employed mail voting until 1896. DNC Br. 34. Voting occurred "during different months" in some States before Congress established election day. *Keisling*, 259 F.3d at 1173. But after Congress enacted the election-day statutes, voting occurred only on election day in every State. *Wetzel*, 120 F.4th at 209.

Giving up half the historical record, Defendants focus on post-enactment history. The State argues that during the Civil War, Nevada allowed "military officials to collect and return ballots" to "election official[s] after election day." NV Br. 49. But that's not quite right. Nevada required "reception of votes" from soldiers take place "[b]etween the hour of eight o'clock a.m., and sunset, on the day of election." 1866 Nev. Stat. 210, 215. The State insists that ballots weren't received by election officials until "*after* election day." NV Br. 51. But the State overlooks that the statute designated the three highest ranking officers to serve as election officials: they took "charge and direction" of the election, controlled the ballot box, counted the votes, checked them against the list of electors, and certified the final lists. 1866 Nev. Stat. at 215-216. Nevada's own history confirms that "*even* during the height of wartime exigency, a ballot could be counted only if *received* by Election Day." *Wetzel*, 120 F.4th at 210. All the other

examples of field voting the State cites "involved soldiers directly placing their ballots into official custody" on Election Day. *Id.*

Post-Civil War "iterations of absentee voting universally required receipt by Election Day." *Id.* The first example any Defendant presents of a State allowing receipt of mail ballots after Election Day is a 1923 Kansas law regulating military ballots. VV Br. 39. This alleged deviation from the universal practice is over seventy-five years removed from Congress establishing Election Day. When "earlier generations addressed the societal problem, but did so through materially different means," it is "evidence" that a "modern regulation" doesn't comport with the text's original meaning. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 26-27 (2022). The handful of statutes Defendants reference from the World War II period and thereafter are "late-in-time outliers," *id.* at 70, that "say nothing about the original public meaning of the Election-Day statutes," *Wetzel*, 120 F.4th at 211. Since "federal law does not permit [Nevada] to extend the period for voting by one day, five days, or 100 days," Nevada's "contrary law is preempted." *Id.* at 215.[*]

## CONCLUSION

For these reasons, this Court should reverse the district court's judgment or, in the alternative, remand with instructions to enter dismissal without prejudice.

---

[*] *Love v. Foster* confirms that elections conducted in violation of federal law violate the rights of candidates and voters. 90 F.3d 1026, 1028 (5th Cir. 1996), *aff'd*, 522 U.S. 67 (1997). The *Anderson-Burdick* balancing test thus doesn't apply. *Contra* DNC Br. 45-47.

DATED this 14th day of April, 2025

Respectfully submitted,

/s/ *Thomas R. McCarthy*

Jeffrey F. Barr
ASHCRAFT & BARR LLP
8275 South Eastern Ave., Ste. 200
Las Vegas, NV 89123
(702) 631-4755
barrj@ashcraftbarr.com

Michael A. Columbo
DHILLON LAW GROUP, INC.
177 Post St., Ste. 700
San Francisco, California 94108
MColumbo@dhillonlaw.com

Thomas R. McCarthy
Gilbert C. Dickey
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that according to the word-count feature of the word processing program used to prepare this brief, this brief contains less than 7,000 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements of Rule 32(a)(1)–(7) and length limits of Circuit Rule 32-1.

*/s/ Thomas R. McCarthy*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing brief on April 14, 2025, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system, which will serve all parties requiring notice.

*/s/ Thomas R. McCarthy*

## CERTIFICATE OF PAPER COPIES

I certify that the paper copies of this brief are identical to the electronic version.

*/s/ Thomas R. McCarthy*